7 A.3d 720

THE COMMITTEE TO RECALL ROBERT MENENDEZ FROM THE OFFICE OF U.S. SENATOR, PLAINTIFF–RESPONDENT, v. NINA MITCHELL WELLS, ESQ., SECRETARY OF STATE, AND ROBERT F. GILES, DIRECTOR OF THE DIVISION OF ELECTIONS, DEFENDANTS–RESPONDENTS, AND UNITED STATES SENATOR ROBERT MENENDEZ, INDISPENSABLE PARTY–APPELLANT.

Argued May 25, 2010—Decided November 18, 2010.

82

*Marc E. Elias,* a member of the District of Columbia bar, argued the cause for appellant (*Genova, Burns & Giantomasi,* attorneys; *Angelo J. Genova,* on the briefs).

*Andrew L. Schlafly* argued the cause for respondents (*Mr. Schlafly* and *Oller & Luzzi,* attorneys; *Mr. Schlafly* and *Richard T. Luzzi,* on the briefs).

*Peter J. Ferrara,* a member of the Pennsylvania bar, submitted a brief on behalf of amicus curiae American Civil Rights Union (*James K. Pryor,* attorney; *Mr. Pryor,* on the briefs).

*Michael P. Laffey* submitted a brief on behalf of amici curiae Conservative Legal Defense and Education Fund, Institute on the Constitution, U.S. Justice Foundation, Gun Owners Foundation, Gun Owners of America, Inc., Vision to America, The Lincoln Institute for Research and Education, Public Advocate of the United States, Inc., U.S. Border Control, U.S. Border Control Foundation, American Coalition for Competitive Trade, and The Constitution Party National Committee (*Messina Law Firm,* attorneys; *Mr. Laffey, Gary G. Kreep,* a member of the California bar, *William J. Olson,* a member of the Commonwealth of Virginia and the District of Columbia bars, and *Herbert W. Titus,* a member of the Commonwealth of Virginia bar, on the brief).

Chief Justice RABNER delivered the opinion of the Court.

This case involves an attempt to recall a United States Senator under a state statute. A committee of voters seeking to recall U.S. Senator Robert Menendez submitted a notice of intention to New Jersey's Secretary of State. That act triggers the recall process outlined in the Uniform Recall Election Law (UREL), *N.J.S.A.* 19:27A–1 to –18, which implements article I, paragraph 2 of the State Constitution.

The Secretary of State, after consulting with the Attorney General, refused to accept the notice, asserting that state recall of a U.S. Senator would violate the Federal Constitution. The Appellate Division, out of a concern about ripeness and respect for the State Constitution, reversed the Secretary's administrative determination and ordered the Secretary to accept the notice for filing.

This case presents important procedural and substantive issues of constitutional dimension. Procedurally, the parties have raised an issue that cannot be sidestepped. They sharply disagree as to whether a U.S. Senator can be recalled under state law. Without a ruling on the legal dispute, the recall process cannot lawfully proceed. That requires us to examine the merits of the case. Although courts are to avoid constitutional issues when possible, in this case there is no other appropriate way to resolve the ongoing conflict.

The U.S. Supreme Court has outlined a framework for addressing similar constitutional questions. We follow its approach by examining the text of the Federal Constitution, relevant historical materials, and principles of our nation's democratic system in order to determine whether states can recall U.S. Senators. That analysis reveals that the Federal Constitution does not permit recall.

According to the historical debates at the Constitutional Convention, the Framers considered and rejected a right to recall. That decision did not go unnoticed. Indeed, it marked a break

with the Articles of Confederation, and many delegates at both the Constitutional Convention and the state ratifying conventions specifically highlighted that recall was not part of the proposed new Constitution. Some did so approvingly; others lamented that recall did not exist. None, however, suggested that recall remained alive under the new constitutional form of government that was created.

The historical record leads to but one conclusion: the Framers rejected a recall provision and denied the states the power to recall U.S. Senators. That finding is consistent with the views of nine Supreme Court Justices who made those same observations, in dicta, in *U.S. Term Limits, Inc. v. Thornton*, 514 *U.S.* 779, 115 *S.Ct.* 1842, 131 *L.Ed.*2d 881 (1995)—even as they divided 5–4 over the primary issue in that case.

Renewed debates around the time of the enactment of the Seventeenth Amendment offer yet more support for that view. In addition, contemporary legal scholars have uniformly reached the same conclusion about recall, despite their differing policy views on the subject.

In drafting a new Constitution, the Founders of this nation envisioned a stable, independent body with two senators from each state, whose six-year terms would enable them to take a long-term view of national issues without being subject to recall. New Jersey has chosen a different path for its State leaders—one that is not challenged and remains good law. In that regard, State voters retain the right to recall State officials. But New Jersey law goes further and permits the recall of federal officers. Such an approach could result in a patchwork of inconsistent rules about recall among the fifty states, which would be contrary to the Federal Constitution.

We therefore find that the matter is ripe for adjudication and conclude that the text and history of the Federal Constitution, as well as the principles of the democratic system it created, do not allow the states the power to recall U.S. Senators. Accordingly, we hold that those portions of the UREL and the State Constitu-

tion which authorize the recall of U.S. Senators are unconstitutional, and we reverse and vacate the Appellate Division's order directing the Secretary to accept the notice of intention to recall Senator Menendez.

## I.

### A.

The UREL implements a state constitutional amendment that New Jersey voters approved in 1993. A public question on the ballot that year asked, "Shall Article 1, paragraph 2 of the Constitution be amended, as proposed by the Legislature, to provide for the recall election of elected officials?" *Public Question No. 1* (1993), *available at* http://nj.gov/state/elections/1993 results/1993–public–questions.pdf. The accompanying interpretive statement explained that the proposed recall provision "applies to any elected official in this State and to the United States Senators and Congressmen elected from New Jersey." *Ibid.*

New Jersey citizens voted in favor of the amendment by a margin of 1,326,657 to 414,925. *Ibid.* As a result, article I, paragraph 2 of the State Constitution now provides, in relevant part,

b. The people reserve unto themselves the power to recall, after at least one year of service, any elected official in this State or representing this State in the United States Congress. The Legislature shall enact laws to provide for such recall elections. Any such laws shall include a provision that a recall election shall be held upon petition of at least 25% of the registered voters in the electoral district of the official sought to be recalled. If legislation to implement this constitutional amendment is not enacted within one year of the adoption of the amendment, the Secretary of State shall, by regulation, implement the constitutional amendment, except that regulations adopted by the Secretary of State shall be superseded by any subsequent legislation consistent with this constitutional amendment governing recall elections. The sufficiency of any statement of reasons or grounds procedurally required shall be a political rather than a judicial question.

[*N.J. Const.* art. I, ¶ 2(b) (Recall Amendment).]

The UREL, which went into effect on May 17, 1995, established procedures for New Jersey citizens to seek to "recall, after at least one year of service in the person's current term of office, any

United States Senator or Representative elected from this State or any State or local elected official." *N.J.S.A.* 19:27A–2.

Under the UREL, a registered voter seeking to initiate recall proceedings must first file "with the appropriate recall election official"—currently, the Secretary of State—a notice of intention containing the name and office of the official to be recalled and information about the sponsors and the committee petitioning for recall. *N.J.S.A.* 19:27A–6. The recall election official must then review the notice of intention within three business days for "compliance with the provisions of [*N.J.S.A.* 19:27A–6]." *N.J.S.A.* 19:27A–7(a).

If the notice is found to be in compliance, the official must imprint her approval and sign her name and office on the notice, return a copy of the approved notice to the recall committee, prepare an estimate of the cost of conducting the recall election if a special election is requested, make the notice available for public inspection, serve a copy on the officer sought to be recalled, and publish the notice of intention in a newspaper. *N.J.S.A.* 19:27A–7(a), (b). If the notice "is found not to be in compliance, the recall election official shall . . . return the notice, together with a written statement indicating the reasons for that finding, to the recall committee, which shall have the opportunity to file a corrected notice of intention." *N.J.S.A.* 19:27A–7(a).

If the notice of intention is accepted, the recall committee must then submit a proposed recall petition to the election official in a form consistent with the requirements listed in *N.J.S.A.* 19:27A–8. The official's approval of the petition starts the relevant time period—320 days for recall of the Governor or a U.S. Senator, and 160 days for all other elected officials—in which the recall committee must gather signatures from twenty-five percent of registered voters in the relevant electoral district as of the date of the preceding general election. *N.J.S.A.* 19:27A–5, –10. (The parties agree that approximately 1.3 million signatures are required.) The signatures are submitted all at once to the recall election official for counting and verification, *N.J.S.A.* 19:27A–11; once the elec-

tion official confirms the signatures on the petition, and any challenge is resolved, a recall election is scheduled. *N.J.S.A.* 19:27A–13(a), (b). If a majority of votes at the recall election favor recalling the sitting official, then "the term of office of the elected official shall terminate upon the certification of the election results"; otherwise, "the official shall continue in office as if no recall election had been held." *N.J.S.A.* 19:27A–16.

### B.

On November 7, 2006, petitioner Robert Menendez was elected to represent New Jersey in the U.S. Senate for a six-year term. In compliance with federal law, the State submitted a "Certificate of Election for Six-Year Term," which the Senate found to "contain all the essential requirements." 153 *Cong. Rec.* S1, S3 (daily ed. Jan. 4, 2007). Senator Menendez took the required oath of office and was officially seated in the Senate on January 4, 2007. *Id.* at S4. His term is set to end on January 3, 2013. *Id.* at S3.

On September 25, 2009, pursuant to the UREL, plaintiff-respondent, the Committee to Recall Robert Menendez from the Office of U.S. Senator (Committee), submitted to Nina Wells, then-New Jersey Secretary of State (Secretary), and Robert Giles, Director of the Division of Elections (Director of Elections), a notice of intention to recall Senator Menendez. It is undisputed that the Committee included in its notice of intention all the information required by *N.J.S.A.* 19:27A–6. The Committee originally listed three representative sponsors; pending the Secretary's review of the first notice of intention, the Committee filed an amended notice on November 10, 2009, replacing one of the named sponsors. Because it had not received a response from the Secretary by December 1, 2009, the Committee filed a complaint in lieu of prerogative writs with the Law Division seeking to compel the Secretary and the Director of Elections to either accept or reject the notice of intention.

On January 11, 2010, acting on the advice of the Attorney General, the Secretary issued a final agency determination that

"neither the Notice of Intention to Recall nor the Proposed Petition can be accepted for filing or review" because "the qualifications and election of a Member of the United States Senate is a matter of exclusive jurisdiction of federal authority and ... neither the United States Constitution nor federal statute provide[s] for a recall proceeding for a federally-elected official." Three days later, the Secretary and the Director of Elections moved to dismiss the Law Division complaint on the ground that it was moot, and the Committee, in turn, voluntarily dismissed the matter.

In response to the Secretary's determination, on January 13, 2010, the Committee filed an application for emergent relief with the Appellate Division, seeking temporary injunctive relief and expedited review. The Committee named the Secretary and the Director of Elections as defendants. The following day, the Appellate Division permitted the Committee to file its motion and instructed it to serve papers on Senator Menendez, an indispensable party, in addition to the Secretary and the Director of Elections. On February 4, 2010, the Appellate Division granted the Committee's motion to accelerate the appeal, as well as the application of the American Civil Rights Union (ACRU) to participate as amicus curiae.

Before the appellate panel, the Committee presented the following arguments: the Secretary improperly denied the notice of intention even though the notice complied with all statutory requirements; the Secretary, as an agent of the executive branch, was in no position to opine on the validity of the UREL; the constitutionality of the UREL would not be ripe for judicial review until (1) the Committee obtained roughly 1.3 million signatures of registered voters needed to force a recall election, (2) a majority of voters voted to recall Senator Menendez, and (3) the Secretary ordered his recall; and the Committee must be allowed to proceed with the recall process because it is a matter of "core political speech" protected by the Federal and State Constitutions.

Both the Attorney General, on behalf of the Secretary and the Director of Elections, and Senator Menendez asserted the following: the Federal Constitution is the sole legal authority that governs the qualifications and right to expel a Member of Congress; the UREL and the Recall Amendment, which extend to Members of Congress, are therefore unconstitutional; and the issue was ripe for adjudication.

In a published, per curiam decision, the appellate panel questioned the constitutionality of the UREL but declined to "pass[ ] on the ultimate validity of the recall process regarding a United States Senator" and "order[ed] the current Secretary of State to accept and file the petition, and to proceed under the statute." *Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells*, 413 *N.J.Super.* 435, 458, 995 *A.*2d 1109 (App.Div.2010). At the outset, the panel concluded it did not need to address the authority of the Secretary to determine that the UREL was invalid. *Id.* at 440–41, 995 *A.*2d 1109. The panel reasoned that her determination was based on the advice of the Attorney General, who is obligated to "render legal advice to State officers," and whose advice is binding "until ... the courts address the issue." *Id.* at 441, 995 *A.*2d 1109. The panel also noted the benefit of not resolving a constitutional issue that could be addressed at a later time. *Id.* at 446–47, 995 *A.*2d 1109. Nonetheless, the panel stated that it was "disinclined to allow the process to go forward, and the citizens of this State to believe they are participating in a recall process, if it is certain that the court would have to decide, shortly thereafter, that the process was manifestly unconstitutional." *Id.* at 447, 995 *A.*2d 1109. Accordingly, it framed the issue before it as "whether our State's constitutional and statutory recall measures, as applied to a United States Senator, are so manifestly invalid under the Federal Constitution that we must depart from the norms of judicial restraint and compel that the Committee's process in circulating a recall petition be halted." *Id.* at 449, 995 *A.*2d 1109 (citation omitted).

In examining the constitutionality of the UREL, the panel found that "from what has been written and not provided in the Federal Constitution," based both on its text and relevant historical evidence, "one could reasonably conclude that the Constitution precludes the recall of a United States Senator." *Id.* at 451, 995 *A.*2d 1109. In addition, the panel recognized that, in line with the U.S. Supreme Court's holdings in *Thornton, supra,* and *Cook v. Gralike,* 531 *U.S.* 510, 121 *S.Ct.* 1029, 149 *L.Ed.*2d 44 (2001), the Tenth Amendment did not reserve to the States the power to recall U.S. Senators. *Id.* at 452, 995 *A.*2d 1109 (citations omitted).

However, the panel noted that it could "find no case or precedent which ... precludes recall under the Seventeenth Amendment." *Id.* at 452 & n. 13, 995 *A.*2d 1109. Moreover, citing the dissent in *Thornton,* the panel opined that "the silence of the federal Constitution may well result in the conclusion that [the recall of a U.S. Senator] may be done." *Id.* at 455, 995 *A.*2d 1109 (citing *Thornton, supra,* 514 *U.S.* at 845, 115 *S.Ct.* at 1875, 131 *L.Ed.*2d at 926 (Thomas, J., dissenting)). In light of the constitutional ambiguity that it identified, the panel was not "convince[d] ... that [it] can safely predict what the United States Supreme Court would do if it were presented with the issue." *Id.* at 454, 995 *A.*2d 1109.

Therefore, citing to New Jersey's "rich tradition ... of recognizing individual rights that often go beyond the bare minimums conferred by the Federal Constitution," "the overwhelming majority of voters who approved the recall measure in 1993," and respect for "a component of our State's charter that fortifies the democratic role of our citizens," *id.* at 454–55, 995 *A.*2d 1109, the panel perceived "no urgent reason" "to resolve this difficult constitutional issue if the Committee's petition drive fails to collect the necessary, approximately, 1,300,000 signatures." *Id.* at 457, 995 *A.*2d 1109. The panel thus found that there was a "sufficient basis for the Committee to proceed with its initiative and for the Secretary of State to perform her ministerial function" without the Appellate Division "passing on the ultimate validity of the recall process." *Id.* at 457–58, 995 *A.*2d 1109.

On April 27, 2010, this Court granted Senator Menendez's petition for certification. The Attorney General, representing the Secretary and the Director of Elections, elected not to petition for certification in deference to judicial restraint, but has maintained her position that the application of the UREL and the Recall Amendment to U.S. Senators violates the Federal Constitution.[1]

The ACRU and the Conservative Legal Defense and Education Fund, et al. (CLDEF)[2] were permitted to submit briefs as amicus curiae.

## II.

Senator Menendez argues that the constitutionality of the UREL is ripe for review and that the Appellate Division mistak-

---

[1] Specifically, the Attorney General wrote that "the State's position on federal constitutionality remains the same, as articulated in the brief filed below." In that brief, filed with the Appellate Division, the State argued that

> [t]he election of federal elective officials, such as a United States Senator, is a matter of exclusive federal jurisdiction, as provided for in the United States Constitution and corresponding federal statutes. .. Pointedly, there is no explicit federal provision that authorizes a state recall election for a United States Senator. Nor is there any reasonable basis upon which to construe any implicit authority for a state to initiate a recall proceeding against a United States Senator....
>
> .. While the non-enforceability of a state constitutional or statutory provision is not to be taken lightly, under these circumstances, the Supremacy Clause of the United States Constitution compels no other conclusion.

Nonetheless, after arguing to the Appellate Division that the Committee's "ripeness claim [does not] hold any merit," the State reversed its position and is now "mindful that ... a condition precedent to any recall election—obtaining the signatures of approximately 1.3 million registered voters within 320 days—may never come to pass." The State therefore does "not seek to overturn [the Appellate Division's] exercise of judicial prudence and restraint."

[2] The CLDEF's amicus brief was submitted on behalf of the following twelve organizations: the CLDEF; Institute on the Constitution; U.S. Justice Foundation; Gun Owners Foundation; Gun Owners of America, Inc.; Vision to America; The Lincoln Institute for Research and Education; Public Advocate; U.S. Border Control; U.S. Border Control Foundation; American Coalition for Competitive Trade; and The Constitution Party National Committee.

enly invoked "judicial restraint" to justify its refusal to reach the constitutional issues in this case. Specifically, he notes that the Secretary's final agency determination pivoted on a purely legal question and, thus, no further factual development will enhance the fitness of this dispute for review. Moreover, although no recall election is imminent until the necessary signatures have been obtained, if the notice of intention is accepted, Senator Menendez argues he will need to divert attention from his senatorial duties to mount a recall defense, and the public will be harmed if it is led to believe that it is participating in an electoral process that inevitably will be deemed invalid.

In addressing the merits, Senator Menendez argues that by extending recall to U.S. Senators, the UREL and the Recall Amendment conflict with, and are thus preempted by, the Federal Constitution by virtue of the Supremacy Clause. Even if there is no express preemption, he argues that the Tenth Amendment did not reserve to the States the power to recall a Senator. Therefore, Senator Menendez insists that because the UREL and the Recall Amendment cannot be interpreted in a manner that avoids their constitutional defects, this Court must find the laws unconstitutional.

The Committee argues that Senator Menendez's claim is premature because he will not face any judicially recognizable harm unless and until a recall election is held and he loses it, and neither the Senator nor the State will bear any significant expense during the initial signature-gathering stage. The Committee asserts that the UREL is critical to democratic participation in this State and necessary to ensure that New Jersey citizens retain representation when their Senators are not fit or able to fulfill their duties. Absent an express conflict with a federal constitutional or statutory provision, the Committee maintains, States are empowered to adopt procedures for the recall of federal representatives. Finally, the Committee contends that both a private letter by President Washington and the history of the Seventeenth Amendment confirm the constitutional right to recall.

The ACRU and CLDEF filed amicus briefs in support of the Committee. They echo the Committee's arguments with regard to justiciability, the constitutional reservation of a right to recall U.S. Senators, and the democratic principles that recall furthers. The ACRU adds that the UREL gives New Jersey citizens constitutional rights to political activity and expression, with which neither the State nor Senator Menendez can interfere by invoking an alleged "freedom from criticism." The CLDEF emphasizes that recall is nowhere prohibited in the Federal Constitution or foreclosed by U.S. Supreme Court case law.

### III.

#### A.

■ This issue is appropriate for review. The Secretary's refusal to accept and review the notice of intention generated an ongoing controversy. The Committee then filed an action in court. As a result, two adverse parties now dispute whether the final administrative determination was correct, and the decision, if allowed to stand, prevents the recall process from moving forward. Therefore, this is not an abstract or hypothetical debate. The existence of an actual controversy at this time is not called into question because the dispute might be rendered moot if 1.3 million signatures are not gathered; the process simply cannot proceed unless and until the Secretary's decision is reviewed in the courts. In other words, to resolve this case, it is necessary to decide whether the Secretary's decision was correct. The Appellate Division's contrary approach mistakenly glosses over the core issue the parties presented.

■ In addressing this and like disputes, we strive to avoid reaching constitutional questions unless required to do so. *See Harris v. McRae*, 448 *U.S.* 297, 306–07, 100 *S.Ct.* 2671, 2683, 65 *L.Ed.*2d 784, 798 (1980) ("[I]f a case may be decided on either statutory or constitutional grounds, this Court, for sound jurisprudential reasons, will inquire first into the statutory question.");

*Randolph Town Ctr., L.P. v. County of Morris*, 186 *N.J.* 78, 80, 891 *A.*2d 1202 (2006) ("Courts should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." (citations omitted)); *accord Burnett v. County of Bergen*, 198 *N.J.* 408, 420, 968 *A.*2d 1151 (2009) (quoting *Hennessey v. Coastal Eagle Point Oil Co.*, 129 *N.J.* 81, 109, 609 *A.*2d 11 (1992) (Pollock, J., concurring)); *Bell v. Twp. of Stafford*, 110 *N.J.* 384, 389, 541 *A.*2d 692 (1988).

In accordance with that principle, courts routinely consider factual issues and statutory questions first, but this case cannot be resolved on those grounds. In any event, the principle of judicial restraint does not call for courts to avoid ruling on a case if an answer can only be found by resorting to constitutional analysis. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 *U.S.* 439, 445–47, 108 *S.Ct.* 1319, 1323–24, 99 *L.Ed.*2d 534, 544–45 (1988) (addressing constitutional issues notwithstanding canon of judicial restraint because those issues were necessary to decisions below); *see also Citizens United v. Fed. Election Comm'n*, 558 *U.S.* ——, ——, 130 *S.Ct.* 876, 892, 175 *L.Ed.*2d 753, 775 (2010) ("It is not judicial restraint to accept an unsound, narrow argument just so the Court can avoid another argument with broader implications. Indeed, a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling.").

The Committee requests that we direct the Secretary to accept its notice of intention without considering the constitutional dimensions of the state process for recalling a U.S. Senator. We decline to follow that approach, which might entail ordering a constitutional officer to carry out unconstitutional acts. *See N.J.S.A.* 41:1–1 (requiring officers of State to swear to uphold both "the Constitution of the United States and the Constitution of the State of New Jersey"). Simply put, we cannot force the State to apply its imprimatur to a process that may contravene the Federal Constitution while ignoring the very constitutional questions necessary to resolve the case.

The Committee also maintains that the Secretary of State lacked discretion to decline to carry out ministerial acts under section 7 of the UREL. But she did not act alone. In light of doubts about the constitutionality of the recall statute, which she still harbors, she properly sought counsel from the State's chief legal advisor—the Attorney General. *See N.J.S.A.* 52:17A-4(b), (e) (listing among powers and duties of Attorney General, acting through Division of Law, responsibility to give to State officers and departments "legal advice on such matters as they may from time to time require[,] . . . interpret all statutes and legal documents, . . . and otherwise control their legal activities"); *see also Paff v. Div. of Law,* 412 *N.J.Super.* 140, 151, 988 *A.*2d 1239 (App.Div.2010) (recognizing as "well-settled that there exists an attorney-client relationship between the Division [of Law] and the state agencies to which it provides legal advice"), *certif. denied,* 202 *N.J.* 45, 994 *A.*2d 1040 (2010).

By entrusting to the Attorney General the decision whether acceptance of a notice of intention to recall a U.S. Senator would run afoul of the Federal Constitution, the Secretary avoided any impropriety that a unilateral action might have invited. *See Hodges v. Dawdy,* 104 *Ark.* 583, 149 *S.W.* 656, 658 (1912) (finding that Secretary of State, "acting upon the advice of the Attorney General," was within right to refuse to file and certify proposed law and holding that "[m]andamus will not lie to compel an officer to do an act which is forbidden or not authorized by law" (citation omitted)); *Barr v. Watts,* 70 *So.*2d 347, 351 (Fla.1953) (concluding that rather than opine on legality of statute, ministerial officer should "channel[ ] all such attacks on the validity of statutes through the duly-elected public officer whose duty it is to protect the public interest in this respect—the Attorney General of this state" (citation omitted)); *State ex rel. Test v. Steinwedel,* 203 *Ind.* 457, 180 *N.E.* 865, 867 (1932) (allowing ministerial public officers to offer as defense for refusing to follow statute their belief that it is unconstitutional because, among other things, they "usually act, or refuse to act, only after advising with competent legal counsel"); *Associated Hosp. Serv. of Me. v. Mahoney,* 161 *Me.* 391, 213 *A.*2d

712, 717 (1965) (recognizing "when an officer acts under advice of the State's Attorney General" as one exception to "general rule preventing a ministerial officer from questioning the constitutionality of the law under which his performance is sought" (citations omitted)); *State ex rel. Equal. Sav. and Bldg. Ass'n v. Brown,* 334 *Mo.* 781, 68 *S.W.2d* 55, 58 (1934) (acknowledging that although "[o]rdinarily, a ministerial officer . . . may not question the constitutionality of a statute," there is "well-recognized exception that even such an officer can justify his refusal to perform when advised by the Attorney General of the State that the statute is unconstitutional" (citations omitted)); *State ex rel. Johnson v. Baker,* 74 *N.D.* 244, 21 *N.W.2d* 355, 364 (1945) (holding that ministerial officer improperly refused to comply with statute based on belief that it was unconstitutional because "if she doubted its validity her duty was to consult and advise with the attorney general, the chief legal officer of the state, and to act in accordance with such opinion as he might give her").

For all of those reasons, this concrete matter does not present traditional concerns about justiciability. We also note that, at oral argument, counsel for the Committee focused almost entirely on the constitutional question and arguably conceded the issue of ripeness.[3] We nonetheless briefly address the Committee's arguments pertaining to the doctrine of ripeness.

---

[3] At oral argument, the following exchange took place after the Committee's attorney argued at length in favor of the constitutionality of the Recall Amendment:

> THE COURT: Your answer sounds like a concession that it was appropriate for the Secretary of State to evaluate [the constitutional issue], she just evaluated it incorrectly.
> ATTORNEY: Yes . . . I certainly think the Secretary of State should try to abide by all her constitutional obligations, but I think she made a mistake. . . .

Moreover, the Committee initiated this lawsuit to challenge the Secretary's decision. From the Committee's perspective, at least part of the matter was apparently ripe. Although it is theoretically possible that only some, and not all, issues in a case may be ripe at once, it is difficult here to parse (a) the question whether the Secretary was correct in refusing to accept the notice of

### B.

■ A case's ripeness depends on two factors: " '(1) the fitness of issues for judicial review and (2) the hardship to the parties if judicial review is withheld at this time.' " *K. Hovnanian Cos. of N. Cent. Jersey, Inc. v. N.J. Dep't of Envtl. Prot.*, 379 *N.J.Super.* 1, 9, 876 *A.*2d 847 (App.Div.2005) (quoting *966 Video, Inc. v. Mayor & Twp. Comm. of Hazlet Twp.*, 299 *N.J.Super.* 501, 515–16, 691 *A.*2d 435 (Law Div.1995)).

First, this case is fit for review. The issues in dispute are "purely legal," and thus "appropriate for judicial resolution" without developing additional facts. *Abbott Labs. v. Gardner*, 387 *U.S.* 136, 149, 87 *S.Ct.* 1507, 1515, 18 *L.Ed.*2d 681, 691 (1967); *see also Whitman v. Am. Trucking Ass'ns*, 531 *U.S.* 457, 479, 121 *S.Ct.* 903, 915, 149 *L.Ed.*2d 1, 20 (2001) ("The question before us here is purely one of statutory interpretation that would not benefit from further factual development of the issues presented." (citation and internal quotation marks omitted)). Senator Menendez's objection to the portions of the UREL and the Recall Amendment relating to U.S. Senators amounts to a facial challenge, which "is generally 'ripe' much earlier than a claim that the [law] is void *as applied.*" *Trombetta v. Mayor & Comm'rs of Atl. City*, 181 *N.J.Super.* 203, 223, 436 *A.*2d 1349 (Law Div.1981), *aff'd o.b.*, 187 *N.J.Super.* 351, 454 *A.*2d 900 (App.Div.1982); *see also Town of Morristown v. Twp. of Hanover*, 168 *N.J.Super.* 292, 300, 402 *A.*2d 983 (App.Div. 1979) ("Since the invalidity of these provisions is apparent on the face of the ordinance, further factual exploration was not essential. . . ."). Furthermore, because the Secretary's decision constitutes a final administrative agency determination, this Court's review will not "inappropriately interfere with further administrative action." *Am. Trucking Ass'ns, supra*, 531 *U.S.* at 479, 121 *S.Ct.* at 915, 149 *L.Ed.*2d at 21 (citation and internal quotation marks omitted); *see also Mulschler v. N.J. Dep't of Envtl. Prot.*,

---

intention, from (b) the constitutionality of the UREL, on which she based her decision.

337 *N.J.Super.* 1, 10–11, 766 *A.2d* 285 (App.Div.2001) (finding that agency's declaratory ruling was ripe for review because it constituted final determination).

Second, there is a sufficient showing of harm that the parties would suffer if we were to abstain from resolving this case. *N.J.A.C.* 19:25–14.7(b) requires that elected officials who oppose a recall effort under the UREL "shall establish . . . a recall defense committee" subject to various organizational and reporting requirements, as well as limits on the receipt of contributions. A U.S. Senator's coordination and oversight of such efforts would come at the expense of his or her congressional responsibilities.

The recall initiative also injects uncertainty and instability into the State's electoral scheme—inviting citizens to sign petitions in the belief that they are participating in a constitutional process— and adversely affects public confidence in the integrity of the system. *See Smith v. Penta,* 81 *N.J.* 65, 77, 405 *A.2d* 350 (1979) ("[T]he state has a strong public interest in maintaining the integrity of the electoral process."); *cf. City of Newark v. Benjamin,* 144 *N.J.Super.* 58, 66–67, 364 *A.2d* 563 (Ch.Div.) (explaining that "[i]f an ordinance is invalid on its face, it would be a useless expenditure of effort and money to submit it to the electorate before its validity has been determined"), *aff'd o.b.,* 144 *N.J.Super.* 389, 365 *A.2d* 945 (App.Div.1976), *aff'd o.b.,* 75 *N.J.* 311, 381 *A.2d* 793 (1978). In the words of the appellate panel, we are "disinclined to allow the process to go forward, and the citizens of this State to believe they are participating in a recall process, if it is certain that the court would have to decide, shortly thereafter, that the process was manifestly unconstitutional." *Menendez, supra,* 413 *N.J.Super.* at 447, 995 *A.2d* 1109.

■ It is also "importan[t to] decid[e] a challenge to the constitutionality of an election law before it takes effect." *Thorsted v. Gregoire,* 841 *F.Supp.* 1068, 1074 (W.D.Wash.1994) (discussing state-imposed term limits for Members of Congress) (citing *Babbitt v. United Farm Workers Nat'l Union,* 442 *U.S.* 289, 300 n. 12, 99 *S.Ct.* 2301, 2310, 60 *L.Ed.2d* 895, 908 (1979)), *aff'd sub nom.*

*Thorsted v. Munro*, 75 *F*.3d 454 (9th Cir.1996). "Justiciability in [election] cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election." *Babbitt, supra*, 442 *U.S.* at 300 n. 12, 99 *S.Ct.* at 2310, 60 *L.Ed.*2d at 908 (citations omitted); *see also U.S. Term Limits, Inc. v. Hill*, 316 *Ark.* 251, 872 *S.W.*2d 349, 354 (1994) (finding challenge to term limits justiciable before officeholders were excluded from election and noting "daunting" "uncertainty over what the future holds" for elected officials), *aff'd sub nom. Thornton, supra*, 514 *U.S.* 779, 115 *S.Ct.* 1842, 131 *L.Ed.*2d 881. The Committee contends that this matter will not be ripe until Senator Menendez is recalled in an actual election. But when the law giving rise to an election "is defective on its face," there is "good reason" to review the law's validity before voting. *Benjamin, supra*, 144 *N.J.Super.* at 66, 364 *A.*2d 563 (citation and internal quotation marks omitted); *see also Two Guys from Harrison, Inc. v. Furman*, 32 *N.J.* 199, 233, 160 *A.*2d 265 (1960) (addressing post-election challenge to language of ballot question and noting "[t]he time to protest is before the election, and not ... after the event"). *But cf. Herbst Gaming, Inc. v. Heller*, 122 *Nev.* 877, 141 *P.*3d 1224, 1229 (2006) (describing rule in other jurisdictions that "[c]ourts generally refuse, at the preelection stage, to consider ... [whether] the measure, if enacted, would violate substantive federal or state constitutional provisions").[4]

---

[4] Although there is a split of authority among States as to whether a court may entertain a pre-election challenge to a ballot measure, *see Herbst, supra*, 141 *P.*3d at 1228–31 (citing cases), many courts including New Jersey's subscribe to the view that judicial review is permitted when the pre-election objection concerns the facial constitutional validity or form of the measure. *Benjamin, supra*, 144 *N.J.Super.* at 66, 364 *A.*2d 563; *see, e.g., Gray v. Winthrop*, 115 *Fla.* 721, 156 *So.* 270, 272 (1934) ("If a proposed amendment to the State Constitution by its terms specifically and necessarily violates a command or limitation of the Federal Constitution, a ministerial duty of an administrative officer that is part of the prescribed legal procedure for submitting such proposed amendment to the electorate of the State for adoption or rejection, may be enjoined at the suit of proper parties in order to avoid the expense of submission...."); *Berent v. City of Iowa City*, 738 *N.W.*2d 193, 206 (Iowa 2007) (concluding that "preelection review of the substantive facial challenge to [proposed] amendment ... is

Accordingly, in view of the value to the electoral system in clarifying " '[t]he construction of the [UREL], an understanding of its operation, and possible constitutional limits on its application,' " we need not wait to "remove any doubt about the existence of concrete injury." *Babbitt, supra,* 442 *U.S.* at 300 n. 12, 99 *S.Ct.* at 2310, 60 *L.Ed.*2d at 908 (first alteration in original) (quoting *Storer v. Brown,* 415 *U.S.* 724, 737 n. 8, 94 *S.Ct.* 1274, 1282, 39 *L.Ed.*2d 714, 727 (1974)) (finding labor unions' challenge to statute governing election procedures justiciable even though union had not yet participated in election or invoked procedures).

 Finally, any concern about passing judgment on an abstract injury is tempered by the fact that this Court is "not limited to the 'case or controversy' requirement imposed on the federal courts by way of Article III of the Federal Constitution." *In re Application of Boardwalk Regency Corp. for Casino License,* 90

---

ripe"); *Utz v. City of Newport,* 252 *S.W.*2d 434, 437 (Ky.1952) ("There is no right to obtain a vote of the people upon the enactment of [an ordinance proposed by petition, which] would be invalid if approved by them. The court ought not compel the doing of a vain thing and the useless spending of public money."); *In re Initiative Petition No. 349 State Question No. 642,* 838 *P.*2d 1, 8 (Okla.1992) ("A pre-submission determination of the constitutionality of the initiative petition is appropriate and necessary where the proposal is facially unconstitutional and is justified when a costly and futile election may be avoided."); *Schultz v. City of Philadelphia,* 385 *Pa.* 79, 122 *A.*2d 279, 283 (1956) (considering constitutional validity of proposed legislation because it would be "wholly unjustified to allow the voters to give their time, thought and deliberation to the question of the desirability of the legislation ... and thereafter, if their vote be in the affirmative, confront them with a judicial decree that their action was in vain"); *City of Memphis v. Shelby County Election Comm'n,* 146 *S.W.*3d 531, 539 (Tenn.2004) ("[P]re-election challenges to the form or facial constitutional validity of referendum measures are ripe for judicial scrutiny."); *Wyo. Nat'l Abortion Rights Action League v. Karpan,* 881 *P.*2d 281, 288 (Wyo.1994) ("[A]n initiative measure that contravenes direct constitutional language, or constitutional language as previously interpreted by the highest court of a state or of the United States, is subject to review.... [I]f such a measure were clearly unconstitutional, there would be no purpose in submitting it to the electorate under the initiative process."); *cf. Hessey v. Burden,* 615 *A.*2d 562, 574 (D.C.1992) (stopping short of "forbid[ding] pre-election review of constitutional challenges to proposed initiatives" for "extreme cases in which it would be both appropriate and efficient to decide the constitutionality of a proposed initiative").

*N.J.* 361, 367, 447 *A.*2d 1335 (1982) (citations omitted). In that regard, the constitutionality of the UREL and the Recall Amendment is an issue "of major public importance," which also favors review. *City of Atl. City v. Laezza,* 80 *N.J.* 255, 266, 403 *A.*2d 465 (1979).

The Attorney General's current position does not alter the above analysis. Although now prepared to abide by the Appellate Division's approach, which we do not approve, she specifically informed this Court that her view that the UREL is unconstitutional remains unchanged.

## IV.

To assess the constitutionality of term limits for congressional service, the U.S. Supreme Court in *Thornton, supra,* 514 *U.S.* at 806, 115 *S.Ct.* at 1856, 131 *L.Ed.*2d at 902, reviewed the text and structure of the Federal Constitution, relevant historical materials, and principles of our nation's democratic system. We follow that same approach to determine whether States may recall U.S. Senators.

## A.

The Supremacy Clause of the Federal Constitution provides the backdrop for our analysis. It proclaims that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *U.S. Const.* art. VI, cl. 2. Therefore, state laws and constitutional provisions that conflict with the Federal Constitution are "without effect." *Maryland v. Louisiana,* 451 *U.S.* 725, 746, 101 *S.Ct.* 2114, 2129, 68 *L.Ed.*2d 576, 595 (1981) (citing, *inter alia, McCulloch v. Maryland,* 17 *U.S.* (4 *Wheat.*) 316, 427, 4 *L.Ed.* 579 (1819)). In other words, a state may not legislate in an area in which it is preempted by the Federal Constitution or federal law. *Maher v. N.J. Transit Rail Operations, Inc.,* 125 *N.J.* 455,

463, 593 *A*.2d 750 (1991) ("Under our federal system of government the States possess sovereignty concurrent with that of the federal government, subject only to the limitations imposed by the supremacy clause of the United States Constitution, article VI, clause 2." (citation omitted)); *Gangemi v. Berry*, 25 *N.J.* 1, 9, 134 *A*.2d 1 (1957) (stating that although "the legislative authority in the States consists of the full and complete power as it rests in, and may be exercised by, the sovereign power of any country," any state law or constitutional provision is still subject "to the limitations which are contained in the Constitution of the United States" (citation and internal quotation marks omitted)).

That same prohibition applies even when the challenged law, like the UREL, is authorized under a state constitutional provision. *Thornton, supra,* 514 *U.S.* at 809 n. 19, 115 *S.Ct.* at 1858, 131 *L.Ed.*2d at 904 ("We are aware of no case that would even suggest that the validity of a state law under the Federal Constitution would depend at all on whether the state law was passed by the state legislature or by the people directly through amendment of the state constitution."); *Whitcomb v. Chavis,* 403 *U.S.* 124, 180, 91 *S.Ct.* 1858, 1888, 29 *L.Ed.*2d 363, 398 (1971) ("[T]he state constitution must give way to requirements of the Supremacy Clause when there is a conflict with the Federal Constitution."); *Reynolds v. Sims,* 377 *U.S.* 533, 584, 84 *S.Ct.* 1362, 1393, 12 *L.Ed.*2d 506, 540 (1964) ("When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.").

There is also State precedent for evaluating the validity of a state constitutional provision that allegedly conflicts with the Federal Constitution. *E.g., Jackman v. Bodine,* 43 *N.J.* 453, 461, 473, 205 *A*.2d 713 (1964) (holding that state constitutional provision that allocated a portion of seats in Legislature without regard to population violated "one person, one vote" mandate of Fourteenth Amendment as interpreted in *Reynolds, supra,* 377 *U.S.* 533, 84 *S.Ct.* 1362, 12 *L.Ed.*2d 506); *see also McNeil v. Legislative Apportionment Comm'n,* 177 *N.J.* 364, 371, 388, 828 *A*.2d 840 (2003)

(concluding that application of State Constitution's political-boundary requirement to two largest municipalities was preempted by "one person, one vote" mandate and federal Voting Rights Act in light of Supremacy Clause). Bound as we are to adhere to the supreme law of the land, we cannot permit a provision of the State Constitution to remain in force if it conflicts with the Federal Constitution. *Chamber of Commerce of U.S. v. State*, 89 *N.J.* 131, 141, 445 *A.*2d 353 (1982) (quoting *U.S. Const.* art. VI, cl. 2).

### B.

Our analysis begins with the plain language of the Federal Constitution. *See State v. Trump Hotels & Casino Resorts, Inc.*, 160 *N.J.* 505, 527, 734 *A.*2d 1160 (1999). "If the language is clear and unambiguous, the words used must be given their plain meaning." *Ibid.* (citing *Gangemi, supra*, 25 *N.J.* at 10, 134 *A.*2d 1).

The plain language of the Federal Constitution suggests that a Senator's term is fixed and that any right to prevent a Senator from completing his or her term is vested in the Senate, not the States. Article I, Section 3, Clause 1 provides without exception that a Senator's term of service is six years. The only instance in which abridgment of that term is expressly discussed appears in Article I, Section 5, Clause 2, which empowers each house to "determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." Thus, in 1906, the U.S. Supreme Court noted in dicta that a Senator's seat "could only become vacant by his death, or by expiration of his term of office, or by some direct action on the part of the Senate in the exercise of its constitutional powers." *Burton v. United States*, 202 *U.S.* 344, 369, 26 *S.Ct.* 688, 694, 50 *L.Ed.* 1057 (1906). In addition, each house of Congress is "the Judge of the Elections, Returns and Qualifications of its own Members." *U.S. Const.* art. I, § 5, cl. 1.

The Constitution delegates limited power to the States in the realm of elections for Members of Congress: "The Times, Places

and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." *U.S. Const.* art. I, § 4, cl. 1 (Elections Clause). .

 The Committee and amici assert that silence about recall in the text of the Federal Constitution is not a prohibition against recall. To the extent that the Federal Constitution is unclear or ambiguous, we look to interpretive aids for guidance. *Trump Hotels & Casino, supra*, 160 *N.J.* at 527–28, 734 *A.*2d 1160 ("[I]f the language of the constitutional provision is unclear or is susceptible to more than one interpretation, courts may consider sources beyond the instrument itself to ascertain its intent and purpose."). In particular, we examine the intent of the Framers expressed at historical debates at both the Constitutional Convention and the state ratifying conventions.

## C.

Prior to ratification of the Constitution, recall provisions appeared in the Articles of Confederation and in two state constitutions. *Articles of Confederation* art. V, ¶ 1 ("[D]elegates [to Congress] shall be annually appointed ... with a power reserved to each State to recall its delegates, or any of them, at any time within the year, and to send others in their stead for the remainder of the year."); *Pa. Const. of 1776* Declaration of Rights, § VI ("[T]he people have a right, at such periods as they may think proper, to reduce their public officers to a private station, and supply the vacancies by certain and regular elections."); *Vt. Const. of 1786* ch. 1, § VIII ("[T]he people have a right, by their legal representatives, to enact laws for reducing their public officers to a private station, and for supplying their vacancies in a constitutional manner, by regular elections, at such periods as they may think proper."). Thus, leading into the Constitutional Convention, the people and their delegates were familiar with the concept of recall.

At the Constitutional Convention, contrary to the Committee's position, the right of recall was considered and rejected. A recall provision was first introduced at the Convention by Virginia delegate Governor Edmund Randolph as part of the Virginia Plan for structuring the national government. On May 29, 1787, Randolph proposed the following provision to govern Representatives' terms of office:

> Resd. that the members of the first branch of the National Legislature [5] ought to be elected by the people of the several States every [____] for the term of [____]; to be of the age of [____] years at least, to receive liberal stipends by which they may be compensated for the devotion of their time to public service; to be ineligible to any office established by a particular State, or under the authority of the United States, except those [p]eculiarly belonging to the functions of the first branch, during the term of service, and for the space of [____] after its expiration; *to be incapable of re-election for the space of [____] after the expiration of their term of service, and to be subject to recall.*
>
> [1 *Records of the Federal Convention of 1787* 20 (M. Farrand ed. 1911) (hereafter Farrand) (emphasis added).]

However, on June 12, 1787, Governor Charles Pinckney, delegate from South Carolina, moved to strike the portion of the resolution underscored above. 1 *Debates on the Adoption of the Federal Constitution* 172 (J. Elliot ed., 1836) (hereafter Elliot); 5 Elliot 185. The States voted unanimously to approve Pinckney's motion. 1 Elliot 172; 5 Elliot 185.

Certain delegates at the Constitutional Convention who favored recall of Senators acknowledged that recall was not part of the draft constitution. On August 14, 1787, Elbridge Gerry, delegate from Massachusetts, expressed to the rest of the Constitutional Convention his concern over the lack of a recall provision to check the Senate's power:

> If great powers should be given to the Senate, we shall be governed in reality by a junto, as has been apprehended.... [I]t would be very differently constituted from Congress [under the Articles of Confederation]. In the first place, there will be

---

[5] Under the Virginia Plan, there was no analogous recall provision for Senators; "since the members of the second branch were 'to be elected by those of the first,' the drafters of the Virginia Plan apparently saw no need to subject them to recall." Ralph A. Rossum, *Federalism, the Supreme Court, and the Seventeenth Amendment: The Irony of Constitutional Democracy* 100 (2001).

but two deputies from each state; in Congress there may be seven, and are generally five. In the second place, they are chosen for six years; those of Congress annually. *In the third place, they are not subject to recall; those of Congress are.* And, finally, in Congress *nine* states are necessary for all great purposes; here eight *persons* will suffice. Is it to be presumed that the people will ever agree to such a system?

[5 Elliot 422 (first emphasis added).]

Other delegates extolled the benefits of not including a recall provision. On June 6, 1787, as recorded in the notes of Massachusetts delegate Rufus King, John Dickinson of Delaware asserted that

[w]e cannot form a national Govt. as is proposed unless we draw a Br. [ (Branch) ] from the people, & a Br. from the legislature—it is necessary in theory—And essential to the success of the project—The objections to an election by the people arise from the nature of a Free Government and are slight when compared with the excellence of the Government—The 2d Br. must come from the State sovereignties or Legislature, they will be more respectable and they must for yr respectability & duration be something like the British House of peers—

But can one Br. be drawn from the Legislatures who are and have been opposed to ye Genl. Govt. It can—the appointment of the Legisture. of the States, to be in office 3–5 or 7. yrs; *not subject to a recall* and to depend on the Genl. Govt. for yr. support—

[1 Farrand 143 (emphasis added).]

Similarly, on June 18, 1787, New York delegate Alexander Hamilton dismissed the New Jersey Plan for government proposed by delegate William Paterson. Hamilton stressed the need for Congress to be sufficiently independent of the States' influence, which he believed neither the New Jersey Plan nor the Articles of Confederation adequately ensured:

Examine the present confederation, and it is evident they can raise no troops nor equip vessels before war is actually declared. They cannot therefore take any preparatory measure before an enemy is at your door. How unwise and inadequate their powers! and this must ever be the case when you attempt to define powers.—Something will always be wanting. *Congress, by being annually elected, and subject to recall, will ever come with the prejudices of their states rather than the good of the union.* Add therefore additional powers to a body thus organized, and you establish a *sovereignty* of the worst kind, consisting of a single body. Where are the checks? None. They must either prevail over the state governments, or the prevalence of the state governments must end in their dissolution. This is a conclusive objection to the Jersey plan.

[1 Farrand 298 (first emphasis added).]

Hamilton's views were echoed in several of the Federalist Papers, which speak to the objective to safeguard the stability and independence of the Senate and distance it from public opinion. *See The Federalist* Nos. 62–63, at 389–94 (Alexander Hamilton or James Madison) (Henry Cabot Lodge ed., 1888) (hereafter *The Federalist*).

The inability of the States to recall Senators became a rallying point for the Anti–Federalists, who opposed ratification of the Constitution. *See* Amicus, *Antifederalist No. 53: A Plea for the Right of Recall* (1788), *reprinted in The Antifederalist Papers* (M. Borden ed. 1965), at 152–53 (endorsing proposed amendment to Constitution providing for recall to permit "dismiss[ing] from our employ as soon as possible, such persons as do not consult our interest and will not follow our instructions)."

The debate concerning the decision not to insert a recall provision in a draft of the Constitution continued in several of the state ratifying conventions. Certain participants—a number of whom were also delegates to the Constitutional Convention—voiced their displeasure over the absence of a recall provision in the Constitution, which had existed under the Articles of Confederation. On November 29, 1787, for example, delegate Luther Martin of Maryland reported back to the Maryland Legislature that under

> this new system, the senators are to be chosen for six years, instead of being chosen annually; instead of being paid by their States, who send them, they, in conjunction with the other branch, are to pay themselves, out of the treasury of the United States; and *are not liable to be recalled during the period for which they are chosen. Thus, Sir, for six years the senators are rendered totally and absolutely independent of their States, of whom they ought to be the representatives, without any bond or tie between them.* During that time, they may join in measures ruinous and destructive to their States, even such as should totally annihilate their State governments, and *their States cannot recall them,* nor exercise any control over them.
>
> [3 Farrand 194 (emphasis added).]

At the Virginia ratifying convention, two towering figures in our nation's history spoke out against the draft Constitution's failure to allow for recall. On June 13, 1788, Patrick Henry remarked critically that "[a]t present you may appeal to the voice of the

people, and send men to Congress positively instructed to obey your instructions. You can recall them if their system of policy be ruinous. But can you in this government recall your senators? Or can you instruct them? You cannot recall them.... Where, then, is the security?" 3 Elliot 355.

The following day, George Mason offered a similar criticism of the draft Constitution:

The Senators are chosen for six years. They are not recallable for those six years, and are reeligible at the end of the six years. [The new Constitution] stands on a very different ground from the Confederation. By that system, [Senators] were only elected for one year, might be recalled, and were incapable of reelection. But in the new Constitution, instead of being elected for one, they are chosen for six years. They cannot be recalled, in all that time, for any misconduct, and at the end of that long term may again be elected.

[3 Elliot 404.]

*See also* 4 Elliot 213 (N.C., Lancaster) ("If [senators] deviate from their duty, they cannot be excluded and changed the first year, as the members of Congress can now by the Confederation.... The members of Congress now may be recalled. But in this Constitution they cannot be recalled."); 2 Elliot 281 (N.Y., Smith) (listing recall among the "many material checks to the operations of [the present Congress], which the future Congress will not have"); 2 Elliot 62 (Mass., Kingsley) ("In the new Constitution, we are deprived of annual elections, have no rotation, and cannot recall our members; therefore our federal rulers will be masters, and not servants."); 2 Elliot 48 (Mass., Taylor) (arguing that under the Constitution, Senators "are to be chosen for six years[,] but a shadow of rotation provided for, and no power to recall"; thus, "if they are once chosen, they are chosen forever"); 2 Elliot 47 (Mass., Jones) ("*[S]enators* chosen for so long a time will forget their duty to their constituents. We cannot ... recall them."); 3 Farrand 155 (Md., Martin) (reporting that Senators "are to serve Six Years, to pay themselves out of the General Treasury, and are not paid by the State, nor can be recalled for any misconduct or sacrafice [sic] of the Interest of their State that they make before the expiration of that period").

Three States—New York, Pennsylvania, and Rhode Island—proposed amendments that would have explicitly allowed for the recall of Senators. During the debates at the New York Convention, delegate Gilbert Livingston argued for greater checks on the Senate's power. To that end, he introduced a resolution that, among other things, permitted "the legislatures of the several states to recall their senators, . . . and to elect others in their stead, to serve for the remainder of the time for which such senator or senators, so recalled, were appointed." 2 Elliot 289.

Similarly, delegates to the Pennsylvania Convention introduced an amendment providing "[t]hat senators, though chosen for six years, shall be liable to be recalled, or superseded by other appointments, by the respective legislatures of the states, at any time." 2 Elliot 545.

At the Rhode Island Convention, delegates likewise proposed an amendment providing "[t]hat the state legislatures have power to recall, when they think it expedient, their federal senators, and to send others in their stead." 1 Elliot 337.

However, none of those proposals survived, and all thirteen States ratified the Constitution without a recall provision in it. Jay Bybee, *Ulysses at the Mast: Democracy, Federalism, and the Sirens' Song of the Seventeenth Amendment*, 91 *Nw. U.L.Rev.* 500, 529–30 (1997).

It stands to reason that recall was discussed at the state ratifying conventions because it had been rejected at the Constitutional Convention and was not provided for in the Constitution. Plus, the Constitution, of course, was not yet a final, ratified document. Thus, despite the Committee's contrary position, the debates at the state ratifying conventions do inform the historical record.

In light of that substantial body of evidence, it is not surprising that in *Thornton*, the U.S. Supreme Court's majority and dissenting opinions both noted that the Framers rejected a recall provision and denied the States the power to recall. *Thornton, supra,*

514 *U.S.* at 810 & n. 20, 115 *S.Ct.* at 1858, 131 *L.Ed.*2d at 904 (recognizing that "[t]he Framers' decision to reject a proposal allowing for States to recall their own representatives reflects" the "concern that States would try to undermine the National Government" (internal citation omitted)); *id.* at 890, 115 *S.Ct.* at 1896, 131 *L.Ed.*2d at 953 (Thomas, J., dissenting) ("[A] power of recall[ ] [was] denied to the States when [the Framers] specified the terms of Members of Congress.").

A letter from President Washington to his nephew, dated almost two months after the Constitutional Convention in 1787, does not weigh heavily in the analysis. The letter uses general, ambiguous language at best. The relevant passage from the letter follows:

> The power under the Constitution will always be in the People. It is entrusted for certain defined purposes, and for a certain limited period, to representatives of their own chusing; and whenever it is executed contrary to their Interest, or not agreeable to their wishes, their Servants can, and undoubtedly will be, recalled. [Letter from George Washington to Bushrod Washington (Nov. 10, 1787), *in* 29 *The Writings of George Washington from the Original Manuscript Sources 1745–1799* 311 (John C. Fitzpatrick ed., 1931).]

It is not clear whether the letter addresses the recall of an official in the middle of a term or at reelection once a term has been completed. The Thornton Court cited the same letter as support for the argument that "the representatives' need for reelection rather than mandatory rotation was the more effective way to keep representatives responsive to the people." *Thornton, supra,* 514 *U.S.* at 814 & n. 26, 115 *S.Ct.* at 1860, 131 *L.Ed.*2d at 907. In any event, a private letter to a family member can hardly outweigh open, public debate at the conventions.[6]

---

[6] It is noteworthy that not a single State that chose to amend its own constitution following the Convention inserted a recall provision and, further, that the two states that had previously provided for recall in their constitutions conspicuously omitted any parallel provision in their new constitutions. *See generally* Pa. Const. of 1790; Vt. Const. of 1793. *Thornton* urged caution in relying on state practices to measure the contours of the Federal Constitution. *Thornton, supra,* 514 *U.S.* at 823, 115 *S. Ct.* at 1864, 131 *L.Ed.*2d at 912. To the extent state practices immediately following ratification have any weight, they

D.

■■■ The Committee relies on the Seventeenth Amendment as a source of authority for states to recall U.S. Senators. The Seventeenth Amendment, passed in 1913, provided for direct election of U.S. Senators. While it changed the mode of selecting Senators, it did not provide for the power of recall.

The amendment, in relevant part, struck the following under-lined language from Article I, Section 3, Clause 1—"The Senate of the United States shall be composed of two Senators from each State, chosen by the Legislature thereof, for six years; and each Senator shall have one Vote"—and replaced the phrase with "elected by the people thereof." *U.S. Const.* amend. XVII.

In the years preceding the amendment, several Members of Congress spoke favorably in support of recall. 46 *Cong. Rec.* 2495–96 (1911) (statement of S. Bourne) (suggesting that to ad-dress "the securing of proper accountability of government and corporate officials[, which] is one of our greatest national prob-lems," public officials "must serve the composite citizen who represents general welfare or be recalled, where the recall exists, or fail of reelection where an efficient direct primary exists"); 45 *Cong. Rec.* 7125 (1910) (statement of S. Owen) (advocating that certain statewide democratic reforms, including "[t]he right of recall," be adopted on national scale); 26 *Cong. Rec.* 7767 (1894) (statement of Rep. McEttrick) ("The power to recall representa-tives who have repudiated pledges and broken faith with the people is absolutely essential."). However, their oblique endorse-ments of recall did not evolve further.

Others remarked that there was virtually no support for a recall measure and underscored that any direct-election amendment would not encompass recall. In an illuminating statement on April 13, 1911, Representative Thetus Sims of Tennessee thought

---

lend further support to the conclusion that the States understood the Constitu-tion to bar them from instituting recall of Members of Congress.

better of injecting a recall provision into the proposed direct-election amendment.

> [T]he chairman just stated a few moments ago that he was so anxious to get through this resolution in its present form, inasmuch as it had already been considered in another body, where it must pass if passed at all, that he did not want any amendment offered to it, and would ask that every amendment be voted down. Had it not been for that request I should have offered an amendment to this joint resolution. . . . *I will read first the resolution and then the amendment which I expected to offer and which I would offer now if it were not for the fact that I do not propose to attempt to change the resolution in any way by any kind of amendment offered here,* however proper and however much I would like to support it, by a provision that does not meet with the approval of the gentlemen who have this matter in charge and who have looked over and surveyed the whole situation. The resolution reads:
>
>> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof for six years; and each Senator shall have one vote.
>
> Now, just following the words "six years" *I intended to offer this amendment:*
>
>> *With a power reserved to each State to recall its Senators, or either of them, at any time within the period of their service and to send another or others in their stead for the remainder of such period,* and the legislatures of the various States shall by appropriate legislation carry into effect this provision.
>
> I think, in order to retain the confidence of the people in their legislators, their agents, their United States Senators, or even Members of this House, if necessary, whether elected by the direct vote of people or otherwise, they should have the power to dismiss their agents or other servants whenever in their judgment, properly and deliberately ascertained, they no longer represent the people who elected them. . . . I do not believe such a provision for recall would be otherwise than in accord with public sentiment. But I realize that this resolution must go through another body, and I appreciate the sincerity and honesty of statement by the chairman of [the House Committee on Election of President, Vice President, and Representatives in Congress] in not wanting to do anything that will give anybody an excuse to vote against the resolution in its main purposes and objects, that United States Senators shall be elected by a direct vote of the people. Therefore, Mr. Speaker, unless the chairman of the committee changes his mind, *I will not offer this amendment and ask for a vote upon it; but it is time to think about these things.*
>
> [47 *Cong. Rec.* 212 (1911) (statement of Rep. Sims) (emphasis added).]

In the Senate, Senator Weldon Heyburn of Idaho listed the recall of Senators among the parade of horribles that might later become law if a direct-election amendment were accepted. In a session on May 24, 1911, he stated,

What next? What will we face here in this Chamber? The recall perhaps of officers of the United States at the changing whim of local communities. Do you think that you would get a self-respecting man to occupy a position in this Chamber when his right so to do was likely at any time to be challenged and canceled? I would not care for the acquaintance of a man who would accept a place of responsibility on such terms.

[47 *Cong. Rec.* 1543 (1911) (statement of S. Heyburn).]

Two weeks later, on June 7, 1911, Senator Heyburn echoed his earlier remarks:

I know men who will be clamoring for a change in the manner of electing the President of the United States. *I know men who will be clamoring for the recall of the Representatives of the States from Congress. I will not believe that there is a Senator in this body who would support such a proposition,* yet I have seen it in print recently that the Constitution should be changed so as to permit a recall of the representatives of the States in both Houses of Congress. What next? To destroy the life tenure of the judge will be the next one. Those who do not know the Constitution, who have no intelligent conception of its purpose, would support such an amendment. To limit the tenure of office and inject ambition and politics into our United States Supreme Court and break down the stability of our Government is one of them. Just start this raid upon the Constitution once and see where it will end.

[47 *Cong. Rec.* 1742 (1911) (statement of S. Heyburn) (emphasis added).]

Finally, accompanying reports make clear that the Seventeenth Amendment was not designed to interfere with existing law except as to the manner of selecting Senators. H.R.Rep. No. 62–2, at 3 (1911) ("This amendment does not propose in any way to interfere with the fundamental law save and except the method or mode of choosing the Senators."); S.Rep. No. 61–961, at 5 (1911) (same). Based on those reports and the statements of a number of representatives in both Houses, it is clear that the intent of Congress was to confine the scope of the Amendment to the direct election of Senators. *See, e.g.,* 46 *Cong. Rec.* 1977 (1911) (statement of S. Lodge) (arguing that direct-election amendment "is a purely mechanical change" that "is merely a proposition to convert the Senate into a second House of Representatives, with two Congressmen at large from each State, who are to be called Senators and to hold office for six years"); 46 *Cong. Rec.* 1103 (1911) (statement of S. Borah) ("Will the mere change of the mode of selecting United States Senators effect or bring about any fundamental or incidental change in the scheme or plan of govern-

ment as submitted to us by those who framed it?"); 33 *Cong. Rec.* 4123 (1900) (statement of Rep. Robb) ("Except as to the mode of election and filling vacancies, no other change is proposed, and the relation of Senators to their States and to the several departments of the Government will remain unaffected."); *see also* 47 *Cong. Rec.* 1883 (1911) (statement of S. McCumber); 46 *Cong. Rec.* 3544 (1911) (statement of S. Jones). Thus, as Members of Congress took pains to emphasize, the import of the Seventeenth Amendment does not reverberate beyond its specific terms.[7]

### E.

 The Elections Clause, *U.S. Const.* art. I, § 4, cl. 1, also offers no support for recall. That clause "invests the States with the responsibility for the mechanics of congressional elections," namely, their time, place, and manner. *Foster v. Love,* 522 *U.S.* 67, 69, 118 *S.Ct.* 464, 466, 139 *L.Ed.*2d 369, 373 (1997) (citation omitted). By its own terms, it "grant[s] States authority to create procedural regulations," *Thornton, supra,* 514 *U.S.* at 832, 115 *S.Ct.* at 1869, 131 *L.Ed.*2d at 918, not to enact substantive legislation, like recall laws, which would alter the duration of congres-

---

[7] State practices around the time of the Seventeenth Amendment reveal that only Wisconsin, some thirteen years later, adopted a provision for the recall of Members of Congress. Eight other States did not expressly extend recall to federal officers. *Compare Wis. Const.* art. XIII, § 12 (1926) ("The qualified electors of the state, of any congressional, judicial or legislative district ... may petition for the recall of any incumbent elective officer ...."), *with Ariz. Const.* art. 8, part 1, § 1 (1912) (allowing recall of "[e]very public officer in the State"); *Cal. Const.* art. 23, § 1 (1911) (allowing recall of "[e]very elective public officer of the State"); *Colo. Const.* art. XXI, § 1 (1913) (allowing recall of "[e]very elective public officer of the state"); *Kan. Const.* art. 4, § 3 (1914) (allowing recall of "all elected public officials in the state" except judges); *La. Const.* art. 223, § 2 (1914) (allowing recall of "[a]ny officer of this State" except judges); *Idaho Const.* art. VI, § 6 (1912) (allowing recall of "every public officer in the State" except judges); *Nev. Const.* art. 2, § 9 (1912) (allowing recall of "[e]very public officer in the State"); *Wash. Const.* art. 1, § 33 (1912) (allowing recall of "[e]very elective public officer of the state" except judges). *Thornton,* once again, cautioned against reliance on such practices. *Thornton, supra,* 514 *U.S.* at 823, 115 *S.Ct.* at 1864, 131 *L.Ed.*2d at 912.

sional terms of office. In light of the ability of recall "to 'dictate electoral outcomes,'" we find that it is a "'regulation' of congressional elections [that] simply is not authorized by the Elections Clause." *Cook, supra,* 531 *U.S.* at 526, 121 *S.Ct.* at 1040, 149 *L.Ed.*2d at 58 (quoting *Thornton, supra,* 514 *U.S.* at 833–34, 115 *S.Ct.* at 1869, 131 *L.Ed.*2d at 918–19).

## F.

■ Finally, the inability to recall Senators accords with "the 'basic principles of our democratic system'" established in the Constitution. *Thornton, supra,* 514 *U.S.* at 806, 115 *S.Ct.* at 1856, 131 *L.Ed.*2d at 902. The Framers deliberately structured the Senate as a stable and independent body capable of instilling national character, with Senators able to take an extended view of issues in light of their six-year terms. *See, e.g.,* Thomas Cronin, *Direct Democracy: The Politics of Initiative, Referendum, and Recall* 244 (1989) ("U.S. Senators, elected for six-year terms, serve in a chamber that was deliberately designed to take a longer view of the national interest. Recall would alter that view and the federalist principles that justify the existence of the Senate."); Bybee, *supra,* 91 *Nw. U.L.Rev.* at 530 (explaining that "[t]he Founders' unwillingness to have a right of recall reaffirmed their commitment to the six-year term" and their conception of the Senate "as a repository of wisdom and stability"); *see also The Federalist* No. 63, at 391–92 (Alexander Hamilton or James Madison) (asserting that Senate was needed to stimulate "due sense of national character" and could only do so if created as "an assembly ... durably invested with public trust").

To realize that objective, each Senator was made "'an officer of the union, deriving his powers and qualifications from the Constitution, and neither created by, dependent upon, nor controllable by, the states,'" and each "owe[d] primary allegiance not to the people of a State, but to the people of the Nation." *Thornton, supra,* 514 *U.S.* at 803, 115 *S.Ct.* at 1855, 131 *L.Ed.*2d at 900

(quoting 1 J. Story, *Commentaries on the Constitution of the United States* § 627 (3d ed. 1858) (hereafter Story)).

Subjecting Senators to recall could erode the stability and national quality of the Senate and lead to a "patchwork" of state terms of service. *See id.* at 822, 115 *S.Ct.* at 1864, 131 *L.Ed.*2d at 912. Those outcomes would "undermin[e] the uniformity and the national character that the Framers envisioned and sought to ensure" and "sever the direct link that the Framers found so critical between the National Government and the people of the United States." *Ibid.* (citation omitted); *cf. Cook, supra,* 531 *U.S.* at 521, 121 *S.Ct.* at 1037, 149 *L.Ed.*2d at 55 (agreeing that "binding instructions would undermine an essential attribute of Congress by eviscerating the deliberative nature of that National Assembly" (citation omitted)).

In sum, our review of the constitutional text, history, and structure of the democratic system reveals that the Federal Constitution does not permit recall.

## V.

Certain States and a number of legal scholars have likewise concluded that state law cannot be used to recall federal officials. Like New Jersey, numerous other States have laws authorizing procedures for the recall of public officials. *See* Timothy Zick, *The Consent of the Governed: Recall of United States Senators,* 103 *Dick. L.Rev.* 567, 569 n.8 (1999). Three States have expressly drafted their recall provisions to apply to Members of Congress: Michigan, New Jersey, and Wisconsin. *N.J. Const.* art. I, ¶ 2(b); *Wis. Const.* art. 13, § 12; *Mich. Comp. Laws* 168.959 (West 2010); *Wis. Stat. Ann.* 9.10 (West 2010). A fourth State, Arizona, provides for recall of Members of Congress who pledge to resign if not reelected upon a state recall vote. *Ariz.Rev.Stat. Ann.* 19–221 to –222 (West 2010). Additionally, "[m]any of the [thirty-two other] state provisions arguably apply to Members of Congress, as they cover all elected officials, without specifically excluding Members of Congress." Zick, *supra,* 103 *Dick L.Rev.* at 569 n.8.

However, although "[t]here have been many modern examples of efforts to schedule recall elections for U.S. senators," Christopher Terranova, *The Constitutional Life of Legislative Instructions in America*, 84 *N.Y.U. L.Rev.* 1331, 1341 n.65 (2009) (citations omitted), "no Member of Congress has ever been recalled in the history of the United States." J. Maskell, *Congressional Research Service Report for Congress, Recall of Legislators and the Removal of Members of Congress from Office* 1 (2008).

 No precedential case has squarely tested those laws.[8] In a 1972 case filed in federal district court, the Western District of Michigan dismissed a complaint filed directly against U.S. Senator Phillip Hart, which sought a "Declaratory Judgment that persons holding the office of United States Senator in the State of Michigan are subject to recall by procedures set forth in the Michigan Election Law." *Hooper v. Hart*, 56 *F.R.D.* 476, 477 (W.D.Mich. 1972). The court held that the plaintiff failed to identify "a justiciable case or actual controversy" between the parties and instead sought an advisory opinion. *Ibid.* That is the extent of the relevant case law. As the appellate panel accurately observed, "no published opinion from any federal or state court in the nation has yet declared invalid a state recall measure's application to a member of the United States Senate or the House of Representatives." *Menendez, supra,* 413 *N.J.Super.* at 449, 995 *A.2d* 1109.

However, the Attorneys General in several States have opined on the question of recall of federal officers. Most have rejected the notion that state recall laws could be used to recall Members of Congress. *See* 2010 *Op. Att'y Gen. N.D.* 8, at 6 & n.18 (2010) (refusing to interpret recall provision affecting "[a]ny elected official of the state" to extend to federal offices and noting

---

[8] Senator Menendez directs us to an unpublished Idaho state court case discussing the validity of a petition to recall U.S. Senator Frank Church. We decline to address that case in light of the rules of this Court. "[U]npublished opinions do not constitute precedent and 'are not to be cited by any court.' " *Stengart v. Loving Care Agency, Inc.,* 201 *N.J.* 300, 317 n. 4, 990 *A.2d* 650 (2010) (quoting *R.* 1:36–3).

likelihood that U.S. Supreme Court would apply same analysis to state recall law as it did when invalidating state-imposed term limits in *Thornton* ); *Op. Att'y Gen. Ark.* 2010–017, at 5 (2010) (determining that proposed state recall amendment "as it applies to members of Congress is unconstitutional because a state statute cannot alter the terms or qualifications for members of Congress"); *Op. Att'y Gen. La.* 09–0051, at 4–5 (2009) (concluding that Louisiana citizens' efforts to recall U.S. Representative Ahn "Joseph" Cao under state law "cannot proceed" because "the tenth amendment of the United States Constitution does not reserve to the states the authority to remove members of Congress from office"); *Op. Att'y Gen. Kan.* 94–35, at 3 (1994) (concluding that state law authorizing recall of public officials does not apply to Members of Congress and noting that "the United States constitution does not reserve to the states the authority to remove members of congress from office"); 1978 *Op. Att'y Gen. Nev.* 14 (1978) (opining that "notice of intent to circulate a petition to recall one of Nevada's United States Senators" would be intrinsically defective and that Secretary of State should refuse to file it because "[o]nly the United States Senate or the House of Representatives can remove its own members prior to the end of the terms for which they were elected"); 17 *Op. Att'y Gen. Or.* 312, 313 (1935) (advising Oregon Secretary of State not to accept or file petition seeking recall of U.S. Representative because "jurisdiction to determine the right of a Representative in Congress to a seat is vested exclusively in the House of Representatives" and "a Representative in Congress is not subject to recall by the legal voters of the state or of the electoral district from which he was elected"). As evident by her submissions in this case, the New Jersey Attorney General is also of the opinion that a state recall law cannot be applied to a U.S. Senator.

There is only one exception—a 1979 opinion of the Wisconsin Attorney General, who explained that while he had "attempted neither a resolution nor a comprehensive analysis of the constitutional issue," he was "not aware of any clear manifestation of Congress' intent to preempt otherwise compatible state regulation

in this area," and thus could not "state that our recall provisions would be declared unconstitutional on grounds of federal preemption." 68 *Op. Att'y Gen. Wis.* 140 (1979). That opinion, however, preceded the Supreme Court's discussion of States' reserved powers in *Thornton.* *See Thornton, supra,* 514 *U.S.* at 804–05, 115 *S.Ct.* at 1855–56, 131 *L.Ed.*2d at 901–02 (recognizing "Framers' understanding that powers over the election of federal officers had to be delegated to, rather than reserved by, the States" and holding that "[i]n the absence of any constitutional delegation to the States of power to add qualifications to those enumerated in the Constitution, such a power does not exist").

A resounding consensus of legal scholarship agrees that state law cannot be used to recall a Member of Congress. *See, e.g., Senate Election Law Guidebook,* S. Doc. No. 109–10, at 294 (2006) ("[M]aking a United States Senator or United States Representative subject to removal by a state recall election would constitute an additional qualification for office, which the states do not have the constitutional authority to enact."); J. Maskell, *supra,* at 11 ("For a recall provision to be enforceable against a Member of Congress, it would appear that a constitutional amendment would need to be adopted by the requisite number of states authorizing such a recall procedure in the United States Constitution."); Joseph F. Zimmerman, *The Recall: Tribunal of the People* 31 (1997) ("It is clear . . . that the recall cannot be employed against a member of the U.S. Congress without a U.S. constitutional amendment authorizing the recall."); Bybee, *supra,* 91 *Nw. U.L.Rev.* at 530, 558 (noting "[t]he Founders' refusal to authorize recall," that "[r]ecall, as a mechanism of control over senators, has fared no better [than referendum]," and that "state legislatures never enjoyed the right of recall of U.S. senators"); Jefferson B. Fordham, *The Utah Recall Proposal,* 1976 *Utah L.Rev.* 29, 34 (arguing that proposed state initiative permitting recall of Members of Congress, "if adopted, would be an abortive—a legally ineffective—attempt to control something beyond state competence," and "is quite at odds with the federal constitutional design for representation in the Congress"); Terranova, *supra,* 84 *N.Y.U.*

*L.Rev.* at 1331 ("[T]he right to recall representatives [was] a threat that was eliminated by the U.S. Constitution, which did not explicitly provide such authority."); Zick, *supra,* 103 *Dick. L.Rev.* at 591–92 (arguing in favor of recall but recognizing that "[p]articularly in light of the *Thornton* Court's analysis . . . it is probable that the Court would hold that the states or the people lack power under the Constitution to recall a Member of Congress"). By contrast, neither the Committee nor amici offer a single commentator who suggests that state law may validly be employed to recall federal officers.

## VI.

 In a manner consistent with the analysis in section IV of this opinion, the U.S. Supreme Court has considered and rejected supplemental conditions to congressional terms of service. In *Powell v. McCormack,* the Court determined that the House of Representatives has no power to exclude its members so long as they have satisfied the three requirements for membership listed in Article 1, Section 2, Clause 2: age, citizenship, and residency. 395 *U.S.* 486, 489, 89 *S.Ct.* 1944, 1947, 23 *L.Ed.*2d 491, 498 (1969). In reaching that conclusion, the Court looked to relevant historical materials to ascertain whether Article I, Section V of "the Constitution gives the House judicially unreviewable power to set qualifications for membership and to judge whether prospective members meet those qualifications" or, conversely, whether "the Constitution gives the House power to judge only whether elected members possess the three standing qualifications set forth in the Constitution." *Id.* at 520, 89 *S.Ct.* at 1963, 23 *L.Ed.*2d at 516.

The Court found that the Framers rejected a proposal to empower Congress to add to the three qualifications ultimately fixed by the Constitution, *id.* at 532–36, 89 *S.Ct.* at 1970–71, 23 *L.Ed.*2d at 523–25, and that in the century following the Constitutional Convention, "Congress strictly limited its power to judge the qualifications of its members to those enumerated in the Constitution," *id.* at 542, 89 *S.Ct.* at 1974, 23 *L.Ed.*2d at 528.

Therefore, the Court concluded that "Art. I, § 5, is at most a 'textually demonstrable commitment' to Congress to judge only the qualifications *expressly set forth* in the Constitution." *Id.* at 548, 89 *S.Ct.* at 1978, 23 *L.Ed.*2d at 532 (emphasis added).

In *Thornton, supra,* the Court deemed invalid an Arkansas constitutional amendment that imposed limits on the number of terms that a Member of Congress could serve. 514 *U.S.* at 783, 115 *S.Ct.* at 1845, 131 *L.Ed.*2d at 888. In a 5–4 decision, the Court first reviewed *Powell* and reaffirmed the two "important propositions" the case established: that "the Framers intended the qualifications listed in the Constitution to be exclusive" and that it is a "fundamental principle of our representative democracy . . . 'that the people should choose whom they please to govern them.'" *Id.* at 795, 115 *S.Ct.* at 1851, 131 *L.Ed.*2d at 895–96 (alteration in original) (quoting *Powell, supra,* 395 *U.S.* at 547, 89 *S.Ct.* at 1977, 23 *L.Ed.*2d at 531). The Court emphasized that in *Powell,* "[o]ur conclusion that Congress may not alter or add to the qualifications in the Constitution was integral to our analysis and outcome." *Id.* at 796, 115 *S.Ct.* at 1851, 131 *L.Ed.*2d at 896.

In both form and substance, the Court's analysis of the term-limits issue applies to resolving the recall issue. The Court framed its opinion by canvassing "the text and structure of the Constitution, the relevant historical materials, and, most importantly, the 'basic principles of our democratic system.'" *Id.* at 806, 115 *S.Ct.* at 1856, 131 *L.Ed.*2d at 902. The Court found "most striking that nowhere in the extensive ratification debates [was there] any statement by either a proponent or an opponent of rotation that the draft constitution would permit States to require rotation for the representatives of their own citizens." *Id.* at 814, 115 *S.Ct.* at 1860, 131 *L.Ed.*2d at 907. Moreover, "for over 150 years prior to *Powell,* commentators [believed it was] the view of the House that States could not add to the qualifications established in the Constitution." *Id.* at 817, 115 *S.Ct.* at 1862, 131 *L.Ed.*2d at 909. Therefore, the Court concluded that the Constitution, which "allows the States but a limited role in federal elec-

tions, and maintains strict checks on state interference with the federal election process[,] . . . thus creates a uniform national body representing the interests of a single people." *Id.* at 822, 115 *S.Ct.* at 1864, 131 *L.Ed.*2d at 911–12. As noted earlier, the Court emphasized that "a patchwork of state qualifications" would "undermin[e] the uniformity and the national character that the Framers envisioned and sought to ensure." *Id.* at 822, 115 *S.Ct.* at 1864, 131 *L.Ed.*2d at 912.

The Court, in a footnote also referred to above, added that "[t]he Framers' decision to reject a proposal allowing for States to recall their own representatives reflects the[ ] same concerns" that "States would try to undermine the national government." *Id.* at 810 n. 20, 115 *S.Ct.* at 1858, 131 *L.Ed.*2d at 904 (internal citation omitted); *see also id.* at 890, 115 *S.Ct.* at 1896, 131 *L.Ed.*2d at 953 (Thomas, J., dissenting) (recognizing that "a power of recall [was] denied to the States when [the Framers] specified the terms of Members of Congress"). In its strong concluding remarks, the Court declared that a State could prescribe term limits for congressional office only if the Federal Constitution were so amended. *Id.* at 837–38, 115 *S.Ct.* at 1871, 131 *L.Ed.*2d at 921 (majority opinion).

Lastly, in *Cook, supra,* the Court held that Missouri could not threaten to print negative labels on ballots next to the names of congressional candidates who failed to take steps to support term limits, as specified in a state constitutional amendment. 531 *U.S.* at 514–15, 527, 121 *S.Ct.* at 1033–34, 1040, 149 *L.Ed.*2d at 50–51, 58. The Court recognized that aside from the Elections Clause, "[n]o other constitutional provision gives the States authority over congressional elections, and no such authority could be reserved under the Tenth Amendment"; thus, States may only regulate congressional elections to the extent that such power is delegated by the Elections Clause. *Id.* at 522–23, 121 *S.Ct.* at 1038, 149 *L.Ed.*2d at 56. The Court then clarified that the Elections Clause relates to "the procedural mechanisms of elections," which do not include a power to attach adverse labels to

congressional candidates who do not embrace term limits. *Id.* at 526, 121 *S.Ct.* at 1039, 149 *L.Ed.*2d at 58.

In the above trilogy of cases, the Court engaged in historical and textual analysis to determine whether rules could be added to congressional terms of service when the Federal Constitution was otherwise silent. On each occasion, the Court concluded that the express provisions of Article I of the Federal Constitution were fixed and exclusive. That analysis demonstrates that the six-year term in Article I, Section 3, Clause 1 is similarly fixed and exclusive.

### VII.

 Because substantial evidence relating to the text, history, and structure of the Federal Constitution reveals that recall was prohibited to the States and deliberately omitted from the Constitution, the Tenth Amendment does not come into play. Nevertheless, because the Committee and amici rely heavily on the Tenth Amendment, we briefly address their position.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." *U.S. Const.* amend. X. *Thornton* interpreted that provision and directly addressed the question of reserved powers. The Court explained that the Tenth Amendment "could only 'reserve' that which existed before," and thus " '[n]o state can say, that it has reserved, what it never possessed.' " 514 *U.S.* at 802, 115 *S.Ct.* at 1854, 131 *L.Ed.*2d at 899–900 (quoting 1 Story § 627). Therefore, despite any practices that preceded the Federal Constitution, no State is empowered to exercise control over federal elections— except for those areas expressly delegated by the Constitution— because "electing representatives to the National Legislature was a new right, arising from the Constitution itself." 514 *U.S.* at 805, 115 *S.Ct.* at 1856, 131 *L.Ed.*2d at 902; *see also Cook, supra,* 531 *U.S.* at 522–23, 121 *S.Ct.* at 1037–38, 149 *L.Ed.*2d at 55–56. Under that analysis, because the office of U.S. Senator exists only as a

result of the Constitution, States do not possess a reserved right to recall their Senators.

The dissent in *Thornton* took a contrary view. It maintained that the Tenth Amendment encompassed the "default" rule that "[w]here the Constitution is silent about the exercise of a particular power—that is, where the Constitution does not speak either expressly or by necessary implication—the Federal Government lacks that power and the States enjoy it." *Thornton, supra,* 514 *U.S.* at 848, 115 *S.Ct.* at 1876, 131 *L.Ed.*2d at 927 (Thomas, J., dissenting). Thus, it disagreed with the position that "the only powers reserved to the States are those that the States enjoyed before the framing." *Id.* at 857, 115 *S.Ct.* at 1880, 131 *L.Ed.*2d at 933. Nonetheless, even the dissent acknowledged that "a power of recall [was] denied to the States when [the Framers] specified the terms of Members of Congress." *Id.* at 890, 115 *S.Ct.* at 1896, 131 *L.Ed.*2d at 953.

The Committee and amici assert that the omission from the Federal Constitution of any mention of recall—a power that predated the Constitution—signals that the power was reserved to the States or the people via the Tenth Amendment. The Appellate Division accepted that logic to some extent and partially grounded its decision on the premise that "[t]he silence of the federal Constitution may well result in the conclusion that [recall] may be done." *Menendez, supra,* 413 *N.J.Super.* at 455, 995 *A.*2d 1109 (citing *Thornton, supra,* 514 *U.S.* at 845, 115 *S.Ct.* at 1875, 131 *L.Ed.*2d at 926 (Thomas, J., dissenting)).

However, that precise reasoning was explored and repudiated in *Thornton* and *Cook. Cook, supra,* 531 *U.S.* at 522, 121 *S.Ct.* at 1037, 149 *L.Ed.*2d at 55–56 ("Because any state authority to regulate election to those [federal] offices could not precede their very creation by the Constitution, such power 'had to be delegated to, rather than reserved by, the States.'" (quoting *Thornton, supra,* 514 *U.S.* at 804, 115 *S.Ct.* at 1855, 131 *L.Ed.*2d at 901)); *see also* Charles Fried, *The Supreme Court, 1994 Term: Foreword: Revolutions?,* 109 *Harv. L.Rev.* 13, 21–22 (1995) (highlighting

discontinuity between Constitution and Articles of Confederation and observing that "the Constitution waved aside the limitations in the Articles and thus cannot be said to derive its authority in succession from them"). In short, there can be no reserved power relating to the election of Members of Congress, whose very offices originated with the Constitution.

## VIII.

Certain issues presented do not require extended discussion. We start with the Committee's and ACRU's First Amendment argument that the UREL protects constitutional rights to political activity and expression.

Citizens plainly have the right to petition and engage in political speech against elected officials. *See Meyer v. Grant,* 486 *U.S.* 414, 421–22, 108 *S.Ct.* 1886, 1892, 100 *L.Ed.*2d 425, 435 (1988). They are free to petition Congress to allow for recall elections of U.S. Senators. But those rights do not, in and of themselves, establish or guarantee a right to recall under the Federal Constitution. *See, e.g., Kerchner v. Obama,* 612 *F.*3d 204, 209 (3d Cir.2010) (finding "claims under the First Amendment are without merit because the individual right to petition does not 'require government policymakers to . . . respond to individuals' communications on public issues" (citation omitted)); *We the People Found., Inc. v. United States,* 485 *F.*3d 140, 143–44 (D.C.Cir.2007) (holding that "the Supreme Court flatly stated that the First Amendment . . . does not provide a right to a response to or official consideration of a petition" (citing *Minn. State Bd. for Cmty. Colls. v. Knight,* 465 *U.S.* 271, 285, 104 *S.Ct.* 1058, 1066, 79 *L.Ed.*2d 299, 312–13 (1984), and *Smith v. Ark. State Highway Employees,* 441 *U.S.* 463, 465, 99 *S.Ct.* 1826, 1828, 60 *L.Ed.*2d 360, 363 (1979))); *Initiative & Referendum Inst. v. Walker,* 450 *F.*3d 1082, 1099 (10th Cir.2006) (explaining that although "[t]he First Amendment undoubtedly protects the political speech that typically attends an initiative campaign, just as it does speech intended to influence other political decisions[,] . . . it does not protect the right to make law,

by initiative or otherwise"); *Baker v. Deane,* 196 *N.J.Super.* 416, 424, 483 *A.*2d 218 (Law Div.1983) (explaining, in reviewing prior recall statute, that "[t]he constitutional right to petition is to be distinguished from the right to petition for recall" (citation omitted)).

■ The appellate panel also relied on case law that expands state constitutional protections beyond those guaranteed under the Federal Constitution. *See Menendez, supra,* 413 *N.J.Super.* at 454, 995 *A.*2d 1109 (citing *State v. Novembrino,* 105 *N.J.* 95, 144–45, 519 *A.*2d 820 (1987), and *State v. Hunt,* 91 *N.J.* 338, 345–46, 450 *A.*2d 952 (1982)). Those cases do not stand for the proposition that States can provide rights that are preempted, expressly or impliedly, under the Federal Constitution. For instance, a State could not pass a law authorizing its individual departure from the electoral-college system for presidential elections, even if the State acted in the interest of better representing its citizens.

■ The Committee also advances various policy arguments in favor of recall elections, including the importance of affording citizens a mechanism to recall a sick, corrupt, or non-responsive Senator from office. We cannot resolve the policy debate over recall any more than the Thornton Court could decide the wisdom of term limits. *See Thornton, supra,* 514 *U.S.* at 837, 115 *S.Ct.* at 1871, 131 *L.Ed.*2d at 921. A change to the fabric of the Constitution, which a power of recall would represent, can only be achieved through the amendment process. The Thornton Court, in language applicable to this case, made that point abundantly clear:

> We are ... firmly convinced that allowing the several States to adopt term limits for congressional service would effect a fundamental change in the constitutional framework. Any such change must come not by legislation adopted either by Congress or by an individual State, but rather—as have other important changes in the electoral process—through the amendment procedures set forth in Article V. The Framers decided that the qualifications for service in the Congress of the United States be fixed in the Constitution and be uniform throughout the Nation. That decision reflects the Framers' understanding that Members of Congress are chosen by separate constituencies, but that they become, when elected, servants of the people of the United States. They are not merely delegates appointed by

separate, sovereign States; they occupy offices that are integral and essential components of a single National Government. In the absence of a properly passed constitutional amendment, allowing individual States to craft their own qualifications for Congress would thus erode the structure envisioned by the Framers, a structure that was designed, in the words of the Preamble to our Constitution, to form a "more perfect Union."

[*Thornton, supra,* 514 *U.S.* at 837–38, 115 *S.Ct.* at 1871, 131 *L.Ed.*2d at 921.]

## IX.

◼ The UREL and the Recall Amendment offer New Jersey voters the power to hold state and local public servants accountable through the recall process. We recognize the important and legitimate aims of both laws. *See Comm. to Recall Theresa Casagrande from Office of Spring Lake Heights Sch. Bd. Member v. Casagrande,* 304 *N.J.Super.* 496, 501, 507, 701 *A.*2d 478 (Law Div.) (explaining that passage of UREL served to expand to more citizens right to recall public officials and "to eliminate uncertainty in the recall process by setting specific time limits and checks and balances"), *aff'd,* 304 *N.J.Super.* 421, 701 *A.*2d 439 (App.Div.1997).

In light of our finding that portions of the UREL and the Recall Amendment which subject Senators to recall are unconstitutional, the proper way to preserve other aspects of the laws is through judicial surgery. *State v. Natale,* 184 *N.J.* 458, 485, 878 *A.*2d 724 (2005) ("When necessary, courts have engaged in judicial surgery to save an enactment that otherwise would be constitutionally doomed." (internal quotation marks omitted) (citing *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 104, 462 *A.*2d 573 (1983), and *N.J. State Chamber of Commerce v. N.J. Election Law Enforcement Comm'n,* 82 *N.J.* 57, 75, 411 *A.*2d 168 (1980))); *see also Ayotte v. Planned Parenthood of N. New England,* 546 *U.S.* 320, 328–29, 126 *S.Ct.* 961, 967, 163 *L.Ed.*2d 812, 821 (2006) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, . . . to sever its problematic portions while leaving the remainder intact, *United States v. Booker,* 543 *U.S.* 220, 227–29, 125 *S.Ct.* 738, 160 *L.Ed.*2d 621 (2005).").

We therefore conclude that the provisions of the UREL and the Recall Amendment pertaining to U.S. Senators are invalid, but otherwise allow the laws to remain in effect as they relate to state and local officials.[9]

## X.

The dissent uses various techniques to challenge the above analysis. It attempts to bypass the historical record with broad swipes; it champions marginal items; it offers rousing rhetoric about disenfranchising voters; and it appeals to emotion. But those techniques cannot rewrite the Constitution.

In an effort to be complete, this opinion contains each reference to recall that was found in the historical record. The references consistently confirmed that the Framers considered and rejected a right to recall, and that the new Constitution did not permit states to recall U.S. Senators. The dissent offers no direct, contrary proofs in response. Instead, it affirmatively declines to challenge, "point-by-point," the powerful historical record assembled. *Id.* at

---

[9] The pending challenge concerns only the constitutionality of recalling U.S. Senators. The UREL and the Recall Amendment also provide for the recall of members of the House of Representatives, an issue that is not before us. We have grave doubts about the constitutionality of the UREL to the extent that it permits recall of House members in light of applicable portions of the above analysis as well as certain additional historical materials about the recall of House members. *E.g.*, *The Federalist* No. 53, at 335 (Alexander Hamilton or James Madison) ("[W]ho will pretend that the liberties of the people of America will not be more secure under biennial elections, unalterably fixed by such a Constitution, than those of any other nation would be, where elections were annual, or even more frequent, but subject to alterations by the ordinary power of the government?"); 1 Elliot 407–08, 434; 5 Elliot 183–84, 224–26 (detailing Framers' rejection of proposals for one- and three-year terms of office for House members in favor of biennial terms). We also note the obvious practical problems the UREL presents: House members serve two-year terms, *U.S. Const.* art. I, § 2, cl. 1, but the recall process could not begin until after one year in office, *N.J.S.A.* 19:27A–2, and could then last up to 160 days for the gathering of signatures, *N.J.S.A.* 19:27A–10. The process could thus extend into or beyond the next election cycle. Nonetheless, we decline to rule on the question in the absence of a formal challenge.

149, 7 *A*.3d at 763. Such an approach might have advanced the discussion. Argument that appears in its place, however, is unable to erase recorded history.

If the Framers had offered evidence that arguably supported the right to recall, the dissent apparently would have received them differently. Indeed, the limited history that the dissent chooses to champion is revealing. It devotes two full pages to defend Bushrod Washington even though in the end, no matter his accomplishments later in life, the document President Washington sent him was but an ambiguous, private letter to his nephew, which cannot serve as a substitute for volumes of actual, public debates involving the Framers.

 In addition to marginalizing the historical record, the dissent does not spare aspects of U.S. Supreme Court rulings with which it disagrees. For example, straightforward observations about the lack of a right of recall in *Thornton*—made by nine Supreme Court Justices in dicta—were "inexplicably . . . included" by the Court. *Id.* at 152, 7 *A*.3d at 764. But the U.S. Supreme Court is, of course, the ultimate arbiter of the Federal Constitution.

## XI.

For the reasons set forth above, we find that the case is ripe for review and that the Federal Constitution does not allow States the power to recall U.S. Senators. That conclusion is faithful to the rule of law. It is faithful to the written words in the Constitution, as illuminated by the Framers who debated its text and those who participated in the state ratifying conventions. It is guided by relevant case law and informed by thoughtful scholarship. It is also faithful to the enduring form of our constitutional democracy, which the Framers established more than 200 years ago.

We therefore reverse the judgment of the Appellate Division and vacate its order requiring the Secretary to accept the notice of intention.

Justices RIVERA–SOTO and HOENS, dissenting.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 *U.S.* 1, 17, 84 *S.Ct.* 526, 535, 11 *L.Ed.*2d 481, 492 (1964). "[T]he right to vote is inherent in the republican form of government envisaged by ... the Constitution. The House—and now the Senate—are *chosen by the people*." [10] *Baker v. Carr*, 369 *U.S.* 186, 242, 82 *S.Ct.* 691, 723, 7 *L.Ed.*2d 663, 700 (1962) (Douglas, J., concurring) (emphasis supplied). Thus, "[v]oting is clearly a fundamental right." *Lubin v. Panish*, 415 *U.S.* 709, 721, 94 *S.Ct.* 1315, 1322, 39 *L.Ed.*2d 702, 712 (1974) (Douglas, J., concurring). Even without such clear constitutional underpinnings, "the right to vote in state elections is one of the rights historically 'retained by the people' by virtue of the Ninth Amendment[.]" *Id.* at 721 n. *, 94 *S.Ct.* at 1322 n. *, 39 *L.Ed.*2d at 712 n. *.

Our reverence for the right to vote is long-standing. As early as 1702, well before the founding of the Republic, the tradition we inherited from the British courts explicitly recognized that "[a] right that a man has to give his vote at the election of a person to represent him in parliament, there to concur to the making of laws, which are to bind his liberty and property, is a most transcendent thing, and of an high nature. . . . It is a great injury to deprive ... [him] of it[.]" *Ashby v. White*, 2 *Ld. Raym.* 938, 953 (1702) *quoted in Gray v. Sanders*, 372 *U.S.* 368, 375 n. 7, 83 *S.Ct.* 801, 805 n. 7, 9 *L.Ed.*2d 821, 827 n. 7 (1963). Those principles have guided us since the outset of our history as an independent nation:

A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." 2 Elliot's

---

[10] The phrase "and now the Senate" is a reference to the Seventeenth Amendment. Ratified in 1913, it provides that "[t]he Senate of the United States shall be composed of two Senators from each State, *elected by the people thereof* [.]" *U.S. Const.* amend. XVII (emphasis supplied).

Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself.

[*Powell v. McCormack*, 395 *U.S.* 486, 547, 89 *S.Ct.* 1944, 1977, 23 *L.Ed.*2d 491, 531 (1969).]

It is through the exercise of their right to vote that the people, from whom all authority is derived, can make themselves heard. That the people are that ultimate source of authority has been recognized in New Jersey since it was expressed in our first Constitution. Adopted on July 2, 1776, the preamble to that Constitution proclaimed that "all the constitutional authority ever possessed by the kings of Great Britain over these colonies, or their other dominions, was, by compact, derived from the people, and held of them for the common interest of the whole society[.]" *N.J. Const. of 1776*, pmbl. The preamble to New Jersey's second constitution, adopted September 2, 1844, similarly states that "[w]e, the people of the State of New Jersey, ... do ordain and establish this constitution[,]" *N.J. Const. of 1844*, pmbl., a declaration repeated verbatim in the preamble to New Jersey's current constitution, adopted in 1947. *N.J. Const.* pmbl. Noting that continuity in constitutional expression, Professor Williams observes that "the preamble makes it readily apparent that the source of authority for New Jersey's government is and continues to be the people of the state." Robert F. Williams, *The New Jersey State Constitution* 26 (1997).

Consistent with drawing governmental power exclusively from the well-spring of its citizenry, our Constitution explicitly and soundly declares that "[a]ll political power is inherent in the people." *N.J. Const.* art. I, ¶ 2(a). In sharp contrast, it limits the role of government, defining its purpose as follows: "[g]overnment is instituted for the protection, security, and benefit of the people, and they have the right at all times to alter or reform the same, whenever the public good may require it." *Ibid.* That language of limitation is identical to Article I, paragraph 2 of its predecessor Constitution, the Constitution of 1844. *Compare N.J. Const. of 1844*, art. I, ¶ 2 *with N.J. Const.* art. I, ¶ 2(a). In furtherance of

its citizenry's supremacy, this State has long embraced the view that

"legislators are confessedly the mere agents and instruments of the people, to express their sovereign and superior will, to save the necessity of assembling the people in mass; and when, from the very nature of the case, the representative is in honor and good faith, bound to conform his action to the will and desire of his constituents."

[*Hudspeth v. Swayze*, 85 *N.J.L.* 592, 598, 89 *A.* 780 (E. & A.1914) (quoting *State v. Parker*, 26 *Vt.* 357, 364 (1854)).]

More recently, this Court has held that, under our current Constitution, "[t]he citizen is not at the mercy of his servants holding positions of public trust nor is he helpless to secure relief from their machinations except through the medium of the ballot, the pressure of public opinion or criminal prosecution." *Driscoll v. Burlington–Bristol Bridge Co.*, 8 *N.J.* 433, 476, 86 *A.*2d 201 (1952).

Until today, this Court zealously has safeguarded the right of our citizens to be governed only by those who are elected by the people. In *Gangemi v. Rosengard*, 44 *N.J.* 166, 207 *A.*2d 665 (1965), we explained that "despite an impoverished beginning, the right to vote has taken its place among our great values. Indeed the fact that the voting franchise was hoarded so many years testifies to its exalted position in the real scheme of things. It is the citizen's sword and shield." *Id.* at 170, 207 *A.*2d 665. In ringing tones, we have described the right to vote as "the keystone of a truly democratic society." *Ibid.*

The protection of the voting franchise also has found expression in this Court's insistence that "[e]lection laws are to be liberally construed so as to effectuate their purpose." *Kilmurray v. Gilfert*, 10 *N.J.* 435, 440, 91 *A.*2d 865 (1952). That insistence has remained unbroken, *see Deamer v. Jones*, 42 *N.J.* 516, 521, 201 *A.*2d 712 (1964) (citing *Kilmurray, supra*, 10 *N.J.* at 440, 91 *A.*2d 865); *Sadloch v. Allan*, 25 *N.J.* 118, 129, 135 *A.*2d 173 (1957) (same); *Wene v. Meyner*, 13 *N.J.* 185, 197, 98 *A.*2d 573 (1953) (quoting Chief Justice Vanderbilt's majority opinion in *Kilmurray, supra*, 10 *N.J.* at 440, 91 *A.*2d 865), underscoring that "this Court has traditionally given a liberal interpretation to [election] law, 'liberal' in the sense of construing it . . . most importantly *to allow*

*the voters a choice on Election Day." Catania v. Haberle,* 123 *N.J.* 438, 448, 588 *A.*2d 374 (1990) (emphasis supplied).

Shortly after this Court's decision in *Catania v. Haberle,*[11] and giving further expression to the supremacy of its citizenry, in 1993 the people of the State of New Jersey adopted, at a general election, an amendment to the Constitution allowing for the recall of elected officials in limited circumstances. Now codified as Article I, Paragraph 2(b), that constitutional amendment provides in relevant part that

> *[t]he people reserve unto themselves the power to recall,* after at least one year of service, *any elected official* in this State or *representing this State in the United States Congress.* The Legislature shall enact laws to provide for such recall elections. Any such laws shall include a provision that a recall election shall be held upon petition of at least 25% of the registered voters in the electoral district of the official sought to be recalled.

> [*N.J. Const.* art. I, ¶ 2(b) (emphasis supplied).]

In compliance with that constitutional mandate, the Legislature enacted comprehensive legislation to give effect to its provisions. *See* Uniform Recall Election Law, *N.J.S.A.* 19:27A–1 to –18 (provisions for recall of elected officials generally); *N.J.S.A.* 40:41A–88 to –98 (provisions for recall of county elected officials); *N.J.S.A.* 40:69A–168 to –178 (provisions for recall of municipal elected officials generally); *N.J.S.A.* 40:75–25 to –49 (provisions for recall of elected municipal commissioners); *N.J.S.A.* 40:84–12 (provisions for recall of elected municipal councilmen). As Professor Williams also has noted, "[t]he power of recall by the electorate is a major change in New Jersey representative government. The amendment takes the question of the sufficiency of the recall reasons away from the courts." Williams, *supra,* at xxi.

---

11 Although *Catania v. Haberle* was decided on October 2, 1990, the same day in which this Court heard argument in that appeal—thereby allowing the plaintiff's name to appear on the November 1990 ballot as a Republican candidate for the State Assembly, an election that plaintiff won—the opinion in that case was not filed until April 10, 1991, more than six months later. *Supra,* 123 *N.J.* at 438, 440, 442, 588 *A.*2d 374.

Germane to this appeal, and fully consistent with that constitutional mandate, Section 2 of the Uniform Recall Election Law specifically provides that "[p]ursuant to Article I, paragraph 2b. of the New Jersey Constitution, *the people of this State shall have the power to recall,* after at least one year of service in the person's current term of office, *any United States Senator* or Representative *elected from this State* or any State or local elected official in the manner provided herein." *N.J.S.A.* 19:27A-2 (codifying *L.* 1995, *c.* 105, § 2 (eff. May 17, 1995)).

It is against the vivid backdrop of this Court's longstanding fidelity to the principles that serve to safeguard the right of the people to choose by whom they shall be governed that this appeal must be considered. The dispute before this Court about the effort by a group of citizens to recall one of New Jersey's two United States Senators, a senator first elected to that office more than a decade *after* the people amended our Constitution to provide for his recall, is both a weighty and important one. In concluding that the people are powerless to recall him, the majority ignores those clear and fundamental constitutional principles and does so when the matters that are central to this dispute overwhelmingly demand caution rather than a rush to judgment.

## I.

Invoking the provisions of Article I, Paragraph 2(b) of the New Jersey Constitution, *N.J. Const.* art. I, ¶ 2(b), and Section 2 of the Uniform Recall Election Law, *N.J.S.A.* 19:27A-2, under cover dated September 25, 2009, plaintiff The Committee to Recall Robert Menendez from the Office of U.S. Senator filed with defendant the New Jersey Secretary of State a fully executed notice of intention to initiate a recall of one of New Jersey's sitting U.S. Senators. That notice complied in full with the provisions of Section 6 of the Uniform Recall Election Law, *N.J.S.A.* 19:27A-6. Tacitly acknowledging its statutory obligation to, "within three business days of receiving the notice, return a certified copy of the approved notice to [plaintiff,]" *N.J.S.A.* 19:27A-7(a), but without

addressing the substance of that filing, on October 5, 2009, defendant wrote to plaintiff. Rather than returning the certified copy of the approved notice as required by the Uniform Recall Election Law, however, defendant merely "acknowledge[d] receipt of [plaintiff's] Notice of Intention for the purpose of initiating a recall effort against Senator Robert Menendez[,]" and "advis[ed] that [plaintiff's] Notice of Intention is currently under legal review[ and, u]pon completion of this review, [plaintiff] will be notified accordingly."

Nothing happened. Under cover dated November 10, 2009, plaintiff submitted "a second Notice of Intent for the purpose of initiating a recall effort against Senator Robert Menendez." [12] Although again statutorily required to respond to that notice of intention within three business days, defendant still did nothing. It was not until January 11, 2010, two months after the statutory response was required, and only *after* plaintiff had sued for an order compelling defendant to discharge her statutory obligations, that defendant notified [13] plaintiff:

> On or about September 30, 2009, an initial Notice of Intention to Recall United States Senator Robert Menendez, along with a proposed petition, was filed with the Division of Elections, Department of State, in apparent reliance on the New Jersey "Uniform Recall Election Law," [UREL] *N.J.S.A.* 19:27A–1, *et seq.* It has been determined that the qualifications and election of a Member of the United States Senate is a matter of exclusive jurisdiction of federal authority and that neither the United States Constitution nor federal statute[s] provide for a recall proceeding for a federally-elected official.
>
> Therefore, in my capacity as the Chief Election Official of the State of New Jersey, I hereby determine that neither the Notice of Intention to Recall nor the proposed Petition can be accepted for filing or review.

---

[12] Plaintiff's second notice of intention differed from the first only in respect of a substitution of identities of one member of plaintiff for another. There is no substantive difference between plaintiff's first and second notices of intention.

[13] In spite of the fact that the UREL required a response within three business days, no explanation was tendered for this delay; as no claim was made that the notice of intention or petition as filed were deficient or otherwise did not conform to the requirements of the Constitution or the Uniform Recall Election Law, its return, with the mandated statutory approval, should have been a routine, ministerial act.

This is the final administrative agency determination of the matter. An aggrieved party may file an appeal with the New Jersey [Superior] Court, Appellate Division, within 45 days of such determination. *R.* 2:2–03(a)(2).

Very truly yours,

/s/

New Jersey Secretary of State

Two days later, plaintiff appealed and, after adding Senator Menendez as an indispensable party, the Appellate Division reversed. *Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells,* 413 *N.J.Super.* 435, 995 *A.*2d 1109 (App.Div. 2010). Specifically, it "order[ed] the current Secretary of State to accept and file [plaintiff's] petition, and to proceed under the [Uniform Recall Election Law]." [14] *Id.* at 458, 995 *A.*2d 1109. The panel painstakingly explained that, "[i]n so ordering that ministerial act, we should not be understood as passing on the ultimate validity of the recall process regarding a United States Senator or any other underlying issue." *Ibid.* Exercising appropriate restraint and aptly acknowledging the practical effects of its decision, the Appellate Division

neither declare[d] the recall provision in our State Constitution as applied to a United States Senator definitively valid or invalid. There is, and there will be, no necessity for our courts to resolve this difficult constitutional issue if the Committee's petition drive fails to collect the necessary, approximately, 1,300,000 signatures. Pending that possible eventuality, we see no urgent reason to now decide the question of invalidity or validity with finality. All we need to decide, as we have done, is whether there is a sufficient basis for the Committee to proceed with its initiative and for the Secretary of State to perform her ministerial function. To go beyond that limited holding and "embrace unnecessary constitutional questions" would depart from the "older, wiser counsel" of judicial restraint.

---

[14] The Appellate Division's reference to the "current" Secretary of State is a recognition that the final administrative agency decision which was the subject of the appeal had taken place in the waning days of the then-current administration. On Tuesday, November 3, 2009, a gubernatorial election was held in New Jersey. *See N.J. Const.* art. II, § 1, ¶ 1 (providing that "[g]eneral elections shall be held annually on the first Tuesday after the first Monday in November[,]" and that [t]he Governor … shall be chosen at general elections"). As a result of that election, the incumbent Democratic governor was defeated by his Republican challenger. Therefore, the Appellate Division's judgment was directed to the newly-appointed successor in the office of the Secretary of State.

[*Id.* at 457, 995 *A.*2d 1109 (quoting *Scott v. Harris*, 550 *U.S.* 372, 388, 127 *S.Ct.* 1769, 1780, 167 *L.Ed.*2d 686, 698–99 (2007)).]

Defendant demurred on any further judicial review, instead acknowledging "that the Appellate Division correctly pointed out that a condition precedent to any recall election—obtaining the signatures of approximately 1.3 million registered voters within 320 days—may never come to pass." She noted that, "[r]epeatedly invoking principles of judicial restraint," the Appellate Division properly had stayed its judicial hand. She emphasized that "[t]he Appellate Division recognizing the 'grave and momentous consequences of invalidating' New Jersey's constitutional and statutory recall provisions, decided to 'apply caution and restraint.'" She concluded that she would "not seek to overturn this exercise of judicial prudence and restraint." [15]

Senator Menendez, however, sought certification, which was granted. *Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells*, 201 *N.J.* 498, 992 *A.*2d 793 (2010).

## II.

Rather than proceeding with the care and prudence befitting a challenge that seeks to have this Court declare unconstitutional a

---

[15] The majority asserts that defendant "specifically informed this Court that her view that the [Uniform Recall Election Law] is unconstitutional remains unchanged." *Ante* at 103, 7 *A.*3d at 734. That assertion is not entirely accurate, because defendant neither pursued nor participated in the proceedings before this Court. At most, she has not abandoned the originally-expressed view about constitutionality, and an accurate description of the position she has taken before this Court can be found in the two-page letter in which she summarized her position:

> The Appellate Division, recognizing the "grave and momentous consequences of invalidating" New Jersey's constitutional and statutory recall provisions, decided to "apply caution and restraint." *The State will not seek to overturn this exercise of judicial prudence and restraint.*
>
> [ (Emphasis supplied).]

In our view, defendant's own summary of her argument as set forth in the last paragraph of her letter, rather than the majority's representation of her view, is the only fair and faithful expression of defendant's position.

provision of our own State Constitution adopted within recent memory by the people of this State, the majority throws caution aside and rushes onward. Because, however, there is no present need to reach the constitutional question urged upon us and because, in any event, this appeal raises nothing unconstitutional about New Jersey's constitutional and statutory recall election provisions, we dissent.

We address first whether this Court should reach the constitutional issue at all. The majority opines at length that the present controversy is not moot, *ante* at 95–99, 7 *A*.3d at 729–31, and that it is ripe for disposition, *ante* at 99–103, 7 *A*.3d at 731–34. Curiously, however, the majority sidesteps the core determination reached by the Appellate Division's decision: that there is "no urgent reason to now decide the question of invalidity or validity with finality." *Comm. to Recall Robert Menendez from the Office of United States Senator, supra,* 413 *N.J.Super.* at 457, 995 *A*.2d 1109. Thus, the question presented is not whether the controversy before this Court is moot or ripe but, rather, whether this Court should even involve itself in a constitutional quagmire that may never come to pass. Because that is the holding from which this appeal stems, that is the necessary threshold question this Court must address.

That inquiry must start by determining the appropriate standard of review. When, as here, a facial challenge is made to an election law, we are required to view that challenge with a jaundiced eye. As the Supreme Court of the United States recently noted in the context of a claim of unconstitutionality of an election law,

[f]acial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the

Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

[*Wash. State Grange v. Wash. State Republican Party,* 552 *U.S.* 442, 450–51, 128 *S.Ct.* 1184, 1191, 170 *L.Ed.*2d 151, 161 (2008) (citations, internal quotation marks and editing marks omitted).]

Each of the three factors the United States Supreme Court found worthy of comment in *Washington State Grange* is present here. First, in light of the enormous number of signatures that our Constitution and statute require in order to trigger a recall, the question of whether Sen. Menendez in fact will be subject to recall is, at best, rank speculation. Second, in order to reach its result, the majority considers a constitutional issue that is unnecessary for disposition of this case. Finally, declaring unconstitutional a provision of our State Constitution and its implementing legislation clearly and directly frustrates the expressed will of the people of New Jersey. Each of those concerns, standing alone, should give pause; in the aggregate, they compel the exercise of caution and restraint.

Further, our jurisprudence is replete with instances where we have insisted that "we do not address constitutional issues when a narrower, non-constitutional result is available[.]" *United States v. Scurry,* 193 *N.J.* 492, 500 n. 4, 940 *A.*2d 1164 (2008). This Court time and again has held that it "should not reach a constitutional question unless its resolution is imperative to the disposition of litigation." *Randolph Town Ctr., L.P. v. County of Morris,* 186 *N.J.* 78, 80, 891 *A.*2d 1202 (2006) (citations omitted); *see N.J. Div. of Youth & Family Servs. v. S.S.,* 187 *N.J.* 556, 564, 902 *A.*2d 215 (2006) (same); *Gac v. Gac,* 186 *N.J.* 535, 547, 897 *A.*2d 1018 (2006) ("Recently, we restated that a constitutional issue should not be decided 'unless its resolution is imperative to the disposition of litigation.'") (citation omitted); *State v. Fowlkes,* 169 *N.J.* 387, 396, 778 *A.*2d 422 (2001) (declining to reach constitutional question based on "rule that 'a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation'") (citation omitted); *In re N.J. Am. Water Co.,* 169 *N.J.* 181, 197, 777 *A.*2d 46 (2001) (same); *Am. Trucking*

*Ass'ns, Inc. v. State,* 164 *N.J.* 183, 183, 752 *A.*2d 1286 (2000) (stating that "when ultimate constitutional issues are especially fact-sensitive the Court should await, before decision, the presentation of a well-developed record") (citation omitted); *O'Keefe v. Passaic Valley Water Comm'n,* 132 *N.J.* 234, 240, 624 *A.*2d 578 (1993) (stating that, "[a]s we have previously explained, courts should not reach constitutional questions unless necessary to the disposition of the litigation") (citations omitted); *State v. Zucconi,* 50 *N.J.* 361, 364, 235 *A.*2d 193 (1967) ("We decline to consider a constitutional question . . . in a case which does not require such a decision."); *Ahto v. Weaver,* 39 *N.J.* 418, 428, 189 *A.*2d 27 (1963) (stating that "constitutional questions will not be resolved unless absolutely imperative in the disposition of the litigation") (citation omitted); *State v. Salerno,* 27 *N.J.* 289, 296, 142 *A.*2d 636 (1958) ("[W]e should not undertake to resolve a constitutional challenge if the litigation may be disposed of without reaching the fundamental issue[.]").

The operative rule is stated plainly:

> Generally, courts will adjudicate the constitutionality of legislation only if a constitutional determination is absolutely necessary to resolve a controversy between parties. This doctrine of "strict necessity," articulated by the United States Supreme Court in *Rescue Army v. Municipal Court of Los Angeles,* 331 *U.S.* 549, 67 *S.Ct.* 1409, 91 *L.Ed.* 1666 (1947), is well-recognized. Thus, in *Donadio v. Cummmingham [Cunningham ],* 58 *N.J.* 309, 325–26, 277 *A.*2d 375 (1971), we acknowledged that "a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of litigation."

> [*Bell v. Twp. of Stafford,* 110 *N.J.* 384, 389, 541 *A.*2d 692 (1988) (citations omitted).]

In addition, the principle of judicial restraint goes hand-in-hand with the core notion that constitutional questions should be avoided unless "absolutely imperative." In the context of the constitutionality of a statutory enactment, this Court recently noted that:

> As Chief Justice Hughes explained, our judicial restraint springs from a "seemly respect for the act of a co-equal branch of government, as well as for the public interest in the effective operations of government—both elements invoking a 'broad tolerance' in considering a charge of constitutional evasion or excess."

[*Abbott v. Burke*, 196 *N.J.* 544, 550, 960 A.2d 360 (2008) (quoting *N.J. Ass'n on Corr. v. Lan*, 80 *N.J.* 199, 218, 403 A.2d 437 (1979) (citations omitted)).]

Likewise, we are commanded by the precept that

even if we entertained a doubt of constitutionality (which we do not), we would be equally bound, by judicial precedents since the earliest days of our nation, to eschew judicial interference with the legislative will. Chief Justice John Marshall indeed counseled the courts to avoid, where at all possible, confrontation with constitutional issues. Sitting at circuit in *Ex parte Randolph*, 20 *F.Cas.* 242, 254 (C.C.D.Va.1833) (No. 11,558), he stated:

No questions can be brought before a judicial tribunal of greater delicacy than those which involve the constitutionality of a legislative act. If they become indispensably necessary to the case, the court must meet and decide them; but *if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.*

[*N.J. Ass'n on Corr., supra,* 80 *N.J.* at 218, 403 A.2d 437 (emphasis supplied).]

*See also Lewis v. Harris,* 188 *N.J.* 415, 460, 908 A.2d 196 (2006) (chiding dissent for being "willing to part ways from traditional principles of judicial restraint to reach a constitutional issue that is not before us").

The time-honored principle of judicial restraint is moored firmly to the commonsense notion that "while [the] unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon [a court's] own exercise of power is [its] own sense of self-restraint." *United States v. Butler,* 297 *U.S.* 1, 78–79, 56 *S.Ct.* 312, 325, 80 *L.Ed.* 477, 495 (1936) (Stone, J., dissenting). And, Justice Pollock has aptly and pithily summarized the logic that should animate and inform the exercise of judicial restraint; he explained: "Sometimes, the hardest decision is the decision not to decide. Yet the decision not to decide is at the core of judicial restraint." *De Vesa v. Dorsey,* 134 *N.J.* 420, 443, 634 A.2d 493 (1993) (Pollock, J., concurring). An object lesson of the price to be paid for disregarding that irrefutable logic arose a mere decade ago, when this country suffered through repeated—and, some persuasively claim, gratuitous—convulsions from a disputed presidential election. In that charged context, the wise and cautionary note sounded by the Chief Justice of the Florida Supreme Court bears repeating here:

[j]udicial restraint in respect to elections is absolutely necessary because *the health of our democracy depends on elections being decided by voters—not by judges.* We must have the self-discipline not to become embroiled in political contests whenever a judicial majority subjectively concludes to do so because the majority perceives it is "the right thing to do." Elections involve the other branches of government. *A lack of self-discipline in being involved in elections, especially by a court of last resort, always has the potential of leading to a crisis with the other branches of government and raises serious separation-of-powers concerns.*

[*Gore v. Harris,* 772 So.2d 1243, 1264 (Fla.) (Wells, C.J., dissenting), *rev'd sub nom., Bush v. Gore,* 531 *U.S.* 98, 121 *S.Ct.* 525, 148 *L.Ed.*2d 388 (2000) (emphasis supplied).]

We ignore that wisdom and caution at our peril.

Those considerations—the reasons that undergird the exercise of judicial restraint—appropriately and reasonably motivated the Appellate Division to stay its hand and forgo declaring needlessly that a provision of our State Constitution duly adopted by our electorate, together with its implementing legislation, was now, seventeen years after its adoption, somehow unconstitutional. Yet, nowhere in the majority's opinion is there any discussion whatsoever of the reasons or rationale by which the Appellate Division elected to bypass ruling on the underlying constitutional question that the majority instead decides to tackle. More to the point, nowhere does the majority explain why that simple, straightforward, readily understandable and time-honored resolution ought to be disregarded.

In support of its apparent belief that the issue it reaches is of such magnitude that it must be addressed, the majority discusses the two reasons offered by the Senator. First, the majority notes that requiring him to participate in a recall will divert his attention from his important duties, pointing out that his "coordination and oversight of such efforts would come at the expense of his or her congressional responsibilities." *Ante* at 100, 7 *A.*3d at 732. Second, the majority warns that "[t]he recall initiative also injects uncertainty and instability into the State's electoral scheme[.]" *Ibid.* Neither, however, withstands scrutiny. All elected officials are products of the electoral process; as politicians, they live and die by the electoral process and, more importantly, the will of the people. The Senator, like all officials elected since 1995, ran for

and assumed office on notice that his election was subject to recall. Suggesting that recall will diminish his ability to serve or create uncertainty would counsel against its use as to any elected official, a view well out of step with the will of the people.

Moreover, were we to agree with the claim that subjecting an elected official to the sanction of the people somehow diminishes him or her, then an elected official could not be charged with a crime or subjected to a civil lawsuit while in office. But as the United States Supreme Court has held, even civil litigants are not precluded from pursuing claims against elected officials, *see, e.g., Clinton v. Jones,* 520 *U.S.* 681, 705–06, 117 *S.Ct.* 1636, 1650, 137 *L.Ed.*2d 945, 968 (1997) (categorically rejecting stay of proceedings in civil lawsuit against the President of the United States), a conclusion that runs contrary to the concerns expressed by the majority.

In our view, the confluence of relevant considerations—the principle commanding that we avoid a constitutional question unless indispensable to the outcome and the salutary doctrine of judicial restraint—authoritatively counsels that we, like the Appellate Division, stay our hand and allow the recall process to go forward. We so conclude by pragmatically recognizing the daunting task facing plaintiff: securing, within the statutory time period, over 1.3 million signatures, that is, over four thousand signatures per day for 320 consecutive days, on a petition seeking the recall of Sen. Menendez.[16]

---

[16] Section 5 of the Uniform Recall Election Law, *N.J.S.A.* 19:27A–5, requires that a recall petition must be "signed by a number of registered voters of the jurisdiction of the official sought to be recalled equal to at least 25% of the persons registered to vote in that jurisdiction" on the immediately preceding general election; Section 10(a)(1) of the Uniform Recall Election Law, *N.J.S.A.* 19:27A–10(a)(1), provides that, if the person sought to be recalled is a United States Senator, those signatures must be collected within 320 days "from the date that the recall petition receives final approval for circulation from the recall election official[.]" According to the State of New Jersey's official tallies, as of the year 2009, there were 5,223,047 registered voters in the State. *See http://*

Respecting the will of New Jersey's citizens, as reflected in our Constitution, insures that, in the words of Professor Burns, we retain "the Constitution as the people's charter, not a lawyer's contract." James MacGregor Burns, *Packing the Court: The Rise of Judicial Power and the Coming Crisis of the Supreme Court* 254 (2009). Addressing the question presented in this appeal with the humility these circumstances requires is consistent with Thomas Jefferson's well expressed words, that there is "no safe depository of the ultimate powers of society but the people themselves; and if we think them not enlightened enough to exercise their control with wholesome discretion, the remedy is not to take it from them, but to inform their discretion by education." Letter from Thomas Jefferson to William C. Jarvis (Sept. 28, 1820). Our failure to follow that simple guide will make prophetic once again Abraham Lincoln's very public and focused attack on what was then viewed as a stark example of judicial tyranny:

> the candid citizen must confess that *if the policy of the government upon vital questions, affecting the whole people, is to be irrevocably fixed by decisions of the Supreme Court,* the instant they are made, in ordinary litigation between parties, in personal actions, *the people will have ceased to be their own rulers, having to that extent practically resigned their government into the hands of that eminent tribunal.*
>
> [Abraham Lincoln, *First Inaugural Address* (Mar. 4, 1861) (emphasis supplied) (commenting on United States Supreme Court's decision in *Dred Scott v. Sandford,* 60 *U.S.* 393, 19 *How.* 393, 15 *L.Ed.* 691 (1857)).]

In short, in the circumstances presented in this appeal, there is no need to reach the question of whether New Jersey's recall

---

*www.state.nj.us/education/data/vote/10/Registeredvotertotalswitholdcalculation.pdf.* Twenty-five percent of that number is slightly over 1.3 million.

It is ironic that, although over 1.3 million signatures now would be required to seek the recall of Sen. Menendez, he was elected to office in 2006 by less than that number; according to the New Jersey Department of State, the number of registered voters in 2006 was 4,836,401, *see http://www.state.nj.us/state/elections/ 2006results/06primaryelection/06_primary_regs_ballots-cast-rev..pdf,* and Sen. Menendez garnered 1,200,853 votes, *see http://www.state.nj.us/stat/elections/2006 results/06generalelection/2006_official-senate_tallies.pdf,* or 24.8%—fewer than 25%—of the eligible voters in that election.

provisions—either constitutional or statutory—concerning United States Senators elected by the people of New Jersey to represent the people of New Jersey run afoul of the United States Constitution. Therefore, the decision of the Appellate Division exercising judicial restraint and commanding that the ministerial functions in respect of the recall process required of state officials be carried out should be affirmed.

## III.

Tasked with having to prove a negative, namely, that the power to recall does not exist, and burdened by the absence of any clear evidence that its premise is either historically accurate or analytically sound, the majority resorts to the technique of cataloguing separate words and events, as if they represented a unified and coherent whole. In the process, there are references to obscure moments in history, elevation of dicta to lofty heights of predictive certainty, and reliance on information both extrinsic and irrelevant, all of which is held together by an insistence that boils down to the proposition that if a right cannot be found expressly, it must not exist at all. Shoring up that endeavor are dismissive rejections of any and all evidence that detracts from that theme or suggests that it is in error.

In the end, the majority hopes to prove that a Senator is elected for a term and that once chosen he serves that term to its end, without regard for whether his continued service fulfills the will of the people. Because the Constitution's text lacks a direct expression that the people have the right to recall him, the majority concludes that the people are utterly powerless. But that reflects a policy choice, one that cloaks in total immunity anyone who is elected, by even the tiniest percentage of the voters, without regard for what he might do to merit recall. It protects him in spite of the fact that, under our Constitution and our statute, recall could only be accomplished if supported by the cries of an overwhelming number of citizens with contrary views.

That policy preference is a rejection of the alternate choice, one that recognizes that the power of the people to select by whom they shall be governed is far superior to the wishes of an individual, or a political party, or the whole of the body of the Senate. Our great nation survives because it is built on the premise that the federal government is a limited one, with only those powers that the people have chosen to vest in it and, more to the point, because it rests on the fundamental notion that power resides in the people unless and until they grant it elsewhere. Lacking any evidence that the people have ceded their power of recall by explicit declaration, the majority tries to find in their silence support for its wholly-antidemocratic outcome. For us, the sound of more than a million voices demanding the accountability that recall protects should not so willingly be silenced by this Court.

### A.

Much of the majority's opinion is devoted to an exhaustive compilation of historical references designed to demonstrate that the power to recall, which is nowhere mentioned in the text of the Federal Constitution, does not exist. Those materials consist of delegates' notes describing speeches, debates, and proposals of various kinds offered either during the Constitutional Convention itself or during some of the ratifying conventions; portions of selected Federalist Papers; and references to amendments offered or discussed at various stages that would have made the recall right explicit. The aggregate is then used to advance the argument that because the right of recall was discussed but not expressly included in the Federal Constitution, it must have been rejected, obliterated, or deleted.

And yet, nowhere in that pile of information is there anything that approaches the level of clarity on the question that the majority hopes to prove. Nowhere in the lengthy recounting of the exchange of viewpoints that inform any robust debate on a matter as important as the creation of a new Constitution is there

anything that suggests that silence in that document equates with the extinction of a historically recognized right of the people.

On the contrary, the fundamental principles on which the nation was founded, which are embodied in the Federal Constitution itself, which were championed by the Founding Fathers we today revere, and which are infused throughout the decisions of this Court and of the United States Supreme Court, make manifest that the majority's conclusion not only is fundamentally flawed, but that it flies in the face of all we hold dear as citizens of this proud nation.

One could, of course, engage in a point-by-point refutation of each of the sources on which the majority relies, but to do so would be to make the same mistake that the majority does, missing the bigger picture that the mass of materials, viewed individually, inevitably obscures. Instead, rather than engaging in what would be a tedious response to the majority's effort to assemble the best case it can muster for its conclusion, we can, with a few examples, illustrate the essential bankruptcy of the majority's thesis.

The power of recall has deep historical roots, blossoming from fundamental notions of popular sovereignty, that is, that all power resides with the people and that it is only by their consent that the people may be governed. That doctrine finds its most familiar expression in the Declaration of Independence:

> That to secure these Rights, Governments are instituted among Men, deriving their just Powers from the Consent of the Governed, that whenever any Form of Government becomes destructive of these Ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

But its arrival on our shores came far earlier, for themes of popular sovereignty are found in the earliest governing compacts created by the brave souls who came here. The pilgrims, in the Mayflower Compact of 1620, agreed to "enact, constitute and frame, such just and equal Laws, Ordinances, Acts, Constitutions and Offices, from time to time, as shall be thought most meet and

convenient." Two early colonial constitutional compacts, both agreed upon by settlers in 1639, also give voice to the doctrine. *See* Agreement of the Settlers at Exeter in New Hampshire (Aug. 4, 1639) (agreeing to "combine ourselves together to erect and set up among us such Government as shall be to our best discerning agreeable to the Will of God."); Fundamental Agreement, or Original Constitution of the Colony of New Haven, pmbl. (June 4, 1639) [hereinafter Fundamental Agreement] ("[A]ll the free planters assembled together in a general meeting, to consult about settling civil government, according to God."). The right of recall is at least as ancient; although not explicit in either of those early constitutions, it was discussed among the free planters as a way to keep in check the potential excesses of those appointed to positions of power. *See* Fundamental Agreement, *supra*, Query 5. That the doctrine of popular sovereignty is infused in our deepest historical traditions cannot be ignored.

## B.

Because the United States Constitution says nothing about the right of the people to recall a Senator, the majority begins with self-evident proclamations about the Supremacy Clause, *U.S. Const.* art. VI, cl. 2, and the corollary proposition that a conflicting state statute or constitutional provision must yield.[17] As none of that is particularly useful or enlightening, we turn to a review of the Constitution's three provisions addressing the election of Senators.

---

[17] To be sure, we have long held that where our Constitution provides protections more expansive than those embodied in the Federal Constitution, we are not constrained by the limitations that the latter would impose. *State v. Hunt*, 91 *N.J.* 338, 345–46, 450 A.2d 952 (1982) (quoting *Developments in the Law: The Interpretation of State Constitutional Rights*, 95 *Harv. L.Rev.* 1324, 1367 (1982)). Although perhaps one might argue that there is something inherently inconsistent between that logic and the majority's stated devotion to the federal text as it applies here, we ordinarily perceive no such disconnect.

The first, and most directly relevant, is Article I, Section 3, Clause 3. Often referred to as the Qualifications Clause, it lists only three such qualifications, requiring that one who seeks election to the Senate be at least thirty years old, have been a citizen for at least nine years, and be an inhabitant of the State which "he shall be chosen" to represent. The second relevant provision is found in Article I, Section 4, Clause 1, which is often referred to as the Elections Clause or the Time, Place and Manner Clause. That provision creates a mechanism through which, subject to a limited override right granted to Congress, each state's legislature is empowered to make its own regulations governing the election of Senators.[18] The third clause that is relevant to the topic of election of Senators is Article I, Section 5, Clause 2. That clause permits the Senate to "punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member." None of those clauses purports to deprive the people of a state of their right to create a mechanism for recall and none has been interpreted to do so.

In one of the few precedents from the United States Supreme Court cited in this appeal, two of these provisions were considered in the context of an effort in Arkansas to impose a term limit. *See U.S. Term Limits, Inc. v. Thornton*, 514 *U.S.* 779, 115 *S.Ct.* 1842, 131 *L.Ed.*2d 881 (1995). Rejecting the argument of the statute's supporters that a term limit was simply a permissible regulation of the time, place, and manner of elections, the Court's majority focused instead on the Qualifications Clause. *Id.* at 828–35, 115 *S.Ct.* at 1866–70, 131 *L.Ed.*2d at 915–20. The majority found the statute unconstitutional because imposing a term limit amounted to the addition of a qualification, namely, that a Senator not have previously served too many terms. *Id.* at 831, 115 *S.Ct.* at 1868, 131 *L.Ed.*2d at 917. By extension, the United States Supreme Court subsequently considered and struck down Missouri's effort,

---

[18] *See also U.S. Const.* amend. XVII (providing that "[t]he Senate of the United States shall be composed of two Senators from each State, elected by the people thereof"); *infra* at 169–71, 7 A.3d at 775–76.

through an amendment to its constitution adopted in the wake of the decision in *U.S. Term Limits,* that purported to require its congressmen to work for a federal term limits amendment. *See Cook v. Gralike,* 531 *U.S.* 510, 525–26, 121 *S.Ct.* 1029, 1039–40, 149 *L.Ed.*2d 44, 57–58 (2001).

Although the only question before the Court in *U.S. Term Limits* was whether the imposition of a term limit would violate the Qualifications Clause, both the majority and the dissenting opinions, inexplicably, included a reference to a presumed absence of a recall right. *See U.S. Term Limits, supra,* 514 *U.S.* at 810 n. 20, 115 *S.Ct.* at 1858 n. 20, 131 *L.Ed.*2d at 904 n. 20; *id.* at 890, 115 *S.Ct.* at 1896, 131 *L.Ed.*2d at 953 (Thomas, J., dissenting). The majority of this Court relies heavily on those comments, as a result of which we address them briefly.

Not only are the references in both opinions dicta, but it is noteworthy that neither of them includes the sort of detailed and scholarly analysis that ordinarily accompanies a pronouncement of such magnitude. In the majority opinion, recall is mentioned only in a footnote attached to a discussion of the ratification debates about the danger of permitting the states to fix congressional compensation. *See id.* at 810 n. 20, 115 *S.Ct.* at 1858 n. 20, 131 *L.Ed.*2d at 904 n. 20 (citing 1 *Records of the Federal Convention of 1787* 20, 217 (M. Farrand, ed. 1911)) (hereinafter Farrand). In Justice Thomas's dissent, recall is similarly confined to the discussion of the same point and, uncharacteristically, is not supported by citations to the historical record. *See id.* at 890, 115 *S.Ct.* at 1896, 131 *L.Ed.*2d at 953 (Thomas, J., dissenting) (observing that "a power of recall [was] denied to the States when [the Framers] specified the terms of Members of Congress"). Those passing references to recall simply do not demonstrate that, were the question squarely presented, either the majority or the dissenters would find the matter so easily disposed of.

As one scholar has noted, analyzing recall as an added, and therefore unconstitutional, qualification is fundamentally flawed, because it

ignore[s] the crucial distinction the Framers made between the power to expel and the power to exclude Members of Congress. Exclusion of a member by qualification results in a candidate being refused a seat based upon the candidate's failure to meet the stated qualification. Nothing in any state recall statute, however, prohibits a person from being elected and seated, so long as the candidate meets the age, residency, and inhabitancy "qualifications" set forth in Article I. A recall election operates only after a seat is occupied—it is in the nature of an expulsion from office, not an additional "qualification" for office.

[Timothy Zick, *The Consent of the Governed: Recall of United States Senators,* 103 *Dick. L.Rev.* 567, 588 (1999) (footnote omitted).]

The majority of this Court today avoids, as it must, confronting the fact that adding a qualification like a term limit is not only directly contrary to the language of the Qualifications Clause, but is antithetical to the principles espoused by even so ardent a champion of the Federal Constitution as Alexander Hamilton. In his timeless words, uttered during the constitutional debates, it is a fundamental principle of our representative democracy "that the people should choose whom they please to govern them." 2 *Debates on the Adoption of the Federal Constitution* 257 (J. Elliot ed., 1836) (hereinafter Elliot).

James Madison espoused precisely that principle as well, cautioning against unnecessary qualifications that might "fetter the judgment or disappoint the inclination of the people," as the United States Supreme Court noted. *U.S. Term Limits, supra,* 514 *U.S.* at 819, 115 *S.Ct.* at 1863, 131 *L.Ed.*2d at 910 (quoting *The Federalist No. 57,* at 351 (James Madison) (Clinton Rossiter ed., 1961)). Adding such a limitation, which bars a potential candidate from the ballot entirely because he had served an excessive number of terms in office, directly infringes upon the people's right. *Id.* at 819–20, 115 *S.Ct.* at 1862–63, 131 *L.Ed.*2d at 910–11.

But what the majority today fails to see is that recall does not present a similar danger; on the contrary, not only does recall not deprive the people of their choice, but it advances that very right. It does so by permitting those who find the current occupant of the seat unworthy, if they are of sufficient number and determination, to attempt to choose another. And for those who find the current occupant of the office to their liking, their choice is

safeguarded by numerous options guaranteed them at every step. They are free to refuse to sign petitions, thus making an already intentionally high hurdle insurmountable to the petitioners; they may at a recall election itself vote so that their candidate, the subject of the petition, is not recalled from that office; or they may vote to return him to office at the next election if they so choose. To suggest that creating the possibility, however remote, of a recall petition or election, is the unconstitutional addition of a qualification contorts the principles of choice and subverts the free expression of the consent of the governed.

The majority advances a second argument based on Article I, Section 3, asserting that because Clause 1 refers to six years, it creates a fixed and immutable period of time which cannot be altered. That is, because the clause states that Senators shall be selected, in the case of the original constitutional language, by the states' legislatures and shall be "chosen ... for six years," the argument is that this creates a fixed term of office.[19] Of course, even for the majority the term of six years is not actually an immutable one, for they concede that vacancies may occur either by death or through the action of the Senate itself should it decide to expel a member. *See U.S. Const.* art. I, § 5, cl. 2.

In support of its position that, short of death or expulsion, the seat remains one that can only be occupied for an uninterrupted six years, the majority again finds refuge in the words of the United States Supreme Court. *See ante* at 105–06, 7 *A.*3d at 735 (quoting *Burton v. United States,* 202 *U.S.* 344, 369, 26 *S.Ct.* 688, 694, 50 *L.Ed.* 1057, 1066 (1906)). There, the Court said as much, commenting that "[t]he seat into which [a person] was originally inducted as a Senator ... could only become vacant by his death,

---

[19] The argument includes a like argument that because the Seventeenth Amendment, which changed the method of selection to direct election by the people of each state, also provided that Senators shall be "chosen ... for six years," it reinforced the fixed term principle. *See ante* at 113–16, 7 *A.*3d at 740–42. We discuss the historical significance of the Seventeenth Amendment, *infra* at 167–71, 7 *A.*3d at 775–76.

or by expiration of his term of office, or by some direct action on the part of the Senate in the exercise of its constitutional powers." *Burton, supra,* 202 *U.S.* at 369, 26 *S.Ct.* at 694, 50 *L.Ed.* at 1066. But again, as the majority concedes, *ante* at 105–06, 7 *A.*3d at 735, the quote is dicta, because the issue in Burton was whether a Senator could void a federal conviction so that it would not interfere with his service in the Senate. *See Burton, supra,* 202 *U.S.* at 365–70, 26 *S.Ct.* at 692–94, 50 *L.Ed.* at 1064–66. The United States Supreme Court made its observation while rejecting the argument that the conviction disqualified him, noting that it "did not operate, ipso facto, to vacate the seat of the convicted Senator, nor compel the Senate to expel him or to regard him as expelled by force alone of the judgment." *Id.* at 369, 26 *S.Ct.* at 694, 50 *L.Ed.* at 1066.

Nothing in *Burton*'s holding suggests, however, that the Court intended to limit the ways in which a seat may be vacated. Although its list is prefaced by the word "only," the Court simply did not create an exhaustive list. After all, a seat could become vacant if a Senator retired prior to the end of his term, was elected to the office of President or Governor, or was appointed to the cabinet or to a similar post. Since the Court did not mention any of those possibilities, it hardly follows that it intended its list to foreclose all others, including the possibility of recall, an issue that the Court was not called upon to consider. Moreover, in light of the fact that the *Burton* decision predates the 1913 ratification of the Seventeenth Amendment, its value as a predictive guide, once the power to elect reverted from the several state legislatures to the people, is limited.

Turning to the other provisions in the Federal Constitution that are directly relevant to the election and service of Senators, the majority again seeks to prove a negative. It proclaims that the Elections Clause "offers no support for recall," *ante* at 116, 7 *A.*3d at 743, but reaches that conclusion by engaging in reasoning that is, in the end, merely circular. Quoting still more dicta, the majority argues that the clause only permits states to affect "the

mechanics of congressional elections," namely, their time, place, and manner. *Foster v. Love,* 522 *U.S.* 67, 69, 118 *S.Ct.* 464, 466, 139 *L.Ed.*2d 369, 373 (1997) (citation omitted). The majority relies on the United States Supreme Court's reasoning that the clause "grant[s] States authority to create procedural regulations," *U.S. Term Limits, supra,* 514 *U.S.* at 832, 115 *S.Ct.* at 1869, 131 *L.Ed.*2d at 918, overlooking the fact that recall, by affecting the time or manner of an election, could in theory meet that test. More important, however, the majority's reliance on the clause's silence is but a further example of its fundamentally erroneous view that the Federal Constitution must permit recall explicitly or not at all.

The third of the clauses that directly relates to Senators and their terms of office is Article I, Section 5, through which the Senate has been given the authority to expel a member. Apparently relying on the United States Supreme Court's rather limited reading of that section, the majority finds that it must therefore preclude other mechanisms, like recall. In the principal decision about the scope of Section 5, the United States Supreme Court did not address the power to expel, but considered the power of Congress to refuse to seat a duly elected Representative. In short, the Court concluded that the power granted to Congress in Section 5 was limited by the three "qualifications" for members of the House of Representatives established by Article I, Section 2, Clause 2. *See Powell, supra,* 395 *U.S.* at 519–22, 89 *S.Ct.* at 1962–64, 23 *L.Ed.*2d at 515–17. The Court reasoned that any contrary analysis would empower Congress to thwart the will of the people authorized to elect their Representative "as much by limiting whom the people can select as by limiting the franchise itself." *Id.* at 547, 89 *S.Ct.* at 1977, 23 *L.Ed.*2d at 531.

Article I, Section 5, Clause 2, of course, only grants Congress the authority to expel a member, apparently for violations of its Rules or for disorderly behavior, as long as it does so by a two-thirds vote. Nothing in its language, however, suggests that the clause has any relevance to whether the people of a given state

retain the authority to recall. Indeed, the power to expel has neither a logical nor a historical link to the power to recall; instead it was included as a rather ordinary method for internal discipline in any deliberative body. *See* William Rawle, *A View of the Constitution of the United States* 48 (2d ed. 1829) (explaining that "this power . . . is incidental to the nature of all legislative bodies."). Even so, Justice Story warned against its abuse, commenting that the two-thirds majority was added as a safeguard:

> And as a member might be so lost to all sense of dignity and duty as to disgrace the house by the grossness of his conduct, or interrupt its deliberations by perpetual violence or clamor, the power to expel for very aggravated misconduct was also indispensable, not as a common, but as an ultimate redress for the grievance. But such a power, so summary, and at the same time so subversive of the rights of the people, it was foreseen, might be exerted for mere purposes of faction or party, to remove a patriot or to aid a corrupt measure; and it has therefore been wisely guarded by the restriction, that there shall be a concurrence of two-thirds of the members to justify an expulsion.
>
> [1 Joseph Story, *Commentaries on the Constitution of the United States* § 837 (5th ed. 1891) (hereinafter Story).]

In short, the Constitutional Clauses that relate to Senators, their selection, and their service, do not explicitly, or even implicitly, address the right to recall them; nothing in any of those clauses therefore precludes its exercise.

## C.

Searching for support that it cannot find in the three clauses that relate most directly to the subject of Senators and their terms of office, the majority reverts to a discussion of events that took place during the debates both at the Constitutional Convention itself as well as during selected ratifying conventions. In large measure, that review consists of quoting at length comments made by one delegate or another opining on the right of recall, its benefits, and the wisdom of explicitly including it, and on reasons why amendments on the subject were or were not being offered. *See ante* at 106–12, 7 *A.*3d at 735–40. Discussion and comment about recall in general, of course, would be expected, given that the right was expressly conferred on the several states as part of the Articles of Confederation. *See Articles of Confederation* art.

V, ¶ 1. And while some of those speeches suggest that the subject was open to debate, nothing approaches the sort of outright rejection of the right, so fundamental to the power that rests in the people, as the majority would have one believe. That there was discussion is inescapable; that the power is not explicitly mentioned is plain. But the notion that the right therefore does not exist is not proven by those historical observations.

The relatively limited discussions about recall must be understood in their historical context. In creating the new government, the Framers saw much in their experience of governance under the Articles of Confederation that had impeded the creation of unity and cohesion. That document's loose joining together of states with strong individual characters had failed to create anything approaching a cohesive whole and the ability of one or another of the separate states to stymie progress made future unity impossible. *See* Alfred H. Kelly & Winfred A. Harbison, *The American Constitution: Its Origins and Development* 99–101 (5th ed. 1976). Thus, the effort to create a stronger, federal system required significant change. The extensive debates while the Constitution was being drafted about the structure of the Congress epitomize the core concerns. Disputes among the states about how to balance representation between and among populous and sparsely-settled states which spawned the Virginia Plan, favoring the former, and the New Jersey Plan, which protected the latter, dominated the debate. *See id.* at 114–24; 1 Samuel Eliot Morison, Henry Steele Commager & William E. Leuchtenberg, *The Growth of the American Republic* 246–48 (6th ed. 1969) [hereinafter Morison & Commager].

Emblematic of that debate was the battle over the character of the upper house, and its method of selection. Early on during the Constitutional Convention, Edmund Randolph of the Virginia delegation, proposed what became known as the Virginia Plan, a bluntly nationalistic blueprint most likely authored by Madison. *See* Catherine Drinker Bowen, *Miracle at Philadelphia, The Story*

*of the Constitutional Convention* 13–15, 37–39 (1986). It included a plan for the election of the upper house:

> 5. Resold. that the members of the second branch of the National Legislature ought to be elected by those of the first, out of a proper number of persons nominated by the individual Legislatures, to be of the age of ＿＿ years at least; to hold their offices for a term sufficient to ensure their independency, to receive liberal stipends, by which they may be compensated for the devotion of their time to public service; and to be ineligible to any office established by a particular State, or under the authority of the United States, except those peculiarly belonging to the functions of the second branch, during the term of service, and for the space of after the expiration thereof.

[1 Farrand 20–21.]

Although a spirited debate erupted over most of the provisions of the Virginia Plan,[20] *see, e.g.,* Kelly & Harbison, *supra,* at 113–14, as Justice Story later recounted, the part of the Virginia resolution that would have delegated the power to elect the Senate to the House "met . . . with no decided support, and was nega-tived, no State voting in its favor, nine States voting against it, and one being divided." 1 Story § 703. During the debate about the creation of the Senate, other ideas surfaced, including John Dickinson's suggestion "that the members (of the [second] branch ought to be chosen) by the individual Legislatures," which was seconded by Roger Sherman, 1 Farrand 150; James Wilson's argument that they be popularly elected, *id.* at 58, 151; and George Read's proposal "that the Senate should be appointed by

---

[20] The majority points to the fact that the Virginia Plan also included an explicit recall provision relating to members of the "first branch" and that this proposal was voted down as evidence that the right to recall Senators was rejected. *Ante* at 107, 7 *A.3d* at 736. The "first branch" to which the quote refers, however, is not the Senate at all, but instead the body that became the House of Representatives. As such, the majority overlooks the significance of the short terms granted to members of the House, which would make recall of little practical value. Moreover, it overlooks the fact that the debate about the creation of the Senate was more concerned with preventing the states' legislatures from interfering with the operation of the central government, a practice that had doomed the Articles of Confederation to failure. *See* 1 Morison & Commager, *supra,* at 243–44.

the Executive Magistrate out of a proper number of persons to be nominated by the individual legislatures," *id.* at 151.[21]

Following extensive debates, Dickinson's proposal resurfaced and the convention overwhelmingly chose to vest the power to select members of the Senate in the states' legislatures. *Id.* at 156–57. As Justice Story noted, that choice reflects, in part, an effort to create a connection between the state and federal governments that would result in a harmonious system, "and that it would increase public confidence by securing the national government from undue encroachments on the powers of the States." 1 Story § 704. In the end, the limited discussions about recall, a right vested in the legislatures under the Articles of Confederation, were part of a debate about how much power to permit those bodies to exercise, and not about whether the right remained vested in the people.

### D.

The draft of the Constitution that left the convention and made its way through the ratification process was certain to face more debate. And it is in that context that George Washington's letter to his nephew Bushrod Washington, with its explicit assurance that the men who would be elected to the national governing body would be subject to recall, must be viewed. George Washington, after all, had presided over the convention, 1 Farrand 3, had heard the extended debates, and had participated with the others when the convention met as the Committee of the Whole, *see, e.g.,* Bowen, *supra,* at 40–41. It is particularly telling that the majority dismisses this document as merely "a private letter to a family member," *ante* at 112, 7 *A.*3d at 740, because that backhanded reference overlooks, or perhaps proceeds in ignorance of, several important historical facts that bear on the letter's significance.

---

[21] Elsewhere, the role of "Executive Magistrate" is referred to as the "National Executive," but both are references to what became the office of the President. *See* 1 Farrand 152.

For one thing, Bushrod Washington was one of the few men at the time who had graduated from college, having earned his degree from the College of William and Mary in 1778, and who had pursued the study of law both there and in Philadelphia. Lawrence B. Custer, *Bushrod Washington and John Marshall: A Preliminary Inquiry*, 4 *Am. J. Legal Hist.* 34, 36–37 (1960). His study of law was interrupted by his service in the Continental Army, which was notable for his presence at Yorktown when Lord Cornwallis surrendered. *The Supreme Court Justices: Illustrated Biographies, 1789–1993* 52 (Clare Cushman ed., 1993).

It is even more significant that, in 1787, the year the Father of our Nation was writing to him, Bushrod Washington had been elected to serve in the Virginia House of Delegates and, within the year, was selected to serve among the delegates to the Virginia ratifying convention. Custer, *supra*, 4 *Am. J. Legal Hist.* at 39. He went on to become the first professor of law at the University of Pennsylvania, *id.* at 37, and he served on the United States Supreme Court for thirty-one years, *Illustrated Biographies, supra*, at 54, where he was so close an ally and confidante of Chief Justice John Marshall that they were referred to as "one." Herbert A. Johnson, *Symposium: Bushrod Washington*, 62 *Vand. L.Rev.* 447, 448 (2009) (Symposium) (citing Letter to Thomas Jefferson from Justice William Johnson (Dec. 10, 1822), reprinted in part in Donald G. Morgan, *Justice William Johnson, the First Dissenter* 181–82 (1954)). And it was Justice Bushrod Washington, during his tenure on the United States Supreme Court, who penned words that the majority would be well advised to consider today:

> [i]t is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favour of its validity, until its violation of the constitution is proved beyond all reasonable doubt. [*Ogden v. Saunders*, 25 *U.S.* (12 *Wheat.*) 213, 270, 6 *L.Ed.* 606, 625 (1827).]

That George Washington would write his assurance that there remained the right to recall in the Constitution then being proposed for ratification; that he would write those words to one not only his nephew and his eventual heir, *see* Johnson, *supra*, 62

*Vand. L.Rev.* at 451, but to one who was soon to play his own role in the ratification process, hardly merits such derision from this Court.

The majority includes an exhaustive listing of references to recall made during the various ratifying debates, *ante* at 109–12, 130–31, 7 *A.*3d at 738–39, 751, reasoning that because the states did not secure the expression of that right, it ceased to exist. But that discussion overlooks the real focus of the debates. As an example, the majority points to the debate in the New York ratifying convention, without recognizing that the discussion about the resolution on recall was actually part of the debate about the questionable wisdom of delegating the power to elect members of the Senate to the state legislatures in the first place. As to that, Mr. Livingston lamented:

> The people are the best judges who ought to represent them. To dictate and control them, to tell them whom they shall not elect, is to abridge their natural rights.
>
> [2 Elliot 292–93.]

Hamilton advocated, as always, for a strong federal government,[22] in which Senators, in particular, would be free from the sort of "vassalage and dependence" that recall might entail; but there, too, his focus appears to have been on a desire to divorce them from the sort of political intrigue that they would suffer were the power of recall placed into the hands of the several state legislatures, rather than an indictment of, or even a comment on, the residual power of the people to do so. *Id.* at 303. Moreover, the majority's reliance on what transpired in New York overlooks the fact, openly discussed during the same debate, that by that time their views hardly mattered, because nine states had already voted to ratify. 2 Elliot 322, 324–25.

---

[22] Although Hamilton is greatly revered today, one well-respected treatise has pointed out that his idea for the shape of the future United States was more like a "plan for a centralized unitary constitution that would have made the states mere counties—a plan that revealed how completely Hamilton failed to grasp the value of federalism." 1 Morison & Commager, *supra,* at 248.

The references to recall in the ratifying debates in other states are similar in character, some reflecting a speaker's general view that the Constitutional Convention had exceeded its bounds and that a continuation of the confederation was preferable. For example, the majority's reliance on Luther Martin's speeches and his letter, *see ante* at 109–10, 7 *A*.3d at 738, reflects an interesting choice of authority. Described by some historians as the "wild man" of the constitutional convention, *see* Bowen, *supra*, at 119, and notable for having engaged in a two-day long speech in which he "harangued" all opposition, *see* Kelly & Harbison, *supra*, at 120; 1 Farrand 437–42, he believed that the convention was limited by its charge to mere amendments to the Articles of Confederation, and modest ones at that.

An extreme adherent of the principle of state sovereignty, *see* Bowen, *supra*, at 119, he so objected to the obvious efforts of Hamilton and Madison to create an entirely new form of government that he broke the vow of silence to rail against them publicly. He planned to refuse to sign the constitution when it was finalized, *see id.* at 248–49, and worked tirelessly to defeat it in the days leading to the Maryland ratifying convention.[23] His observations about recall, however, were a minute fraction of the arguments he advanced in that effort.

Likewise, the majority's lengthy listing of comments about recall are largely attributable to men who opposed the constitutional scheme being proposed in general. Patrick Henry, for example, refused to participate in the convention, "saying that he 'smelt a rat,'" *Kaufman, supra*, at 17 (quoting from Henry Mayer, *A Son of Thunder: Patrick Henry and the American Republic* 370 (2001 ed.)), and George Mason refused to sign the final document, Kelly & Harbison, *supra*, at 137–38. As with Martin, their observations about recall are but a small fragment of their

---

[23] A recent biographer notes that "Martin was unable to address the Maryland ratifying convention" having been struck by laryngitis. Bill Kauffman, *Forgotten Founder, Drunken Prophet* 108 (2008).

views, and the majority's reliance on those few comments miss the larger, more appropriate, context entirely. The majority's reference to Rhode Island is similarly curious, given that it refused to send any delegates to Philadelphia. 1 Story § 275; 1 Morison & Commager, *supra*, at 244.

Much of the debate in the ratifying conventions centered on the absence of an expression of fundamental rights of the people, a shortcoming that some of those conventions proposed to address through the addition of a bill of rights. *See* 1 Morison & Commager, *supra*, at 259–60. We need devote little attention to that debate, except as it relates to two provisions that eventually became the Ninth and the Tenth Amendments. Understanding the roles that those guarantees were designed to play sheds light on the question of the recall right and the constitutional authority of the voters of this state to assert that right through an amendment to our Constitution. The majority discusses the Tenth Amendment, *see ante* at 125–27, 7 *A*.3d at 748–49, but because recent scholarship suggests that it was designed to complement the Ninth Amendment, *see* Thomas B. McAffee, *A Critical Guide to the Ninth Amendment,* 69 *Temp. L.Rev.* 61, 83 (1996), both inform the debate before this Court.

The two amendments provide:

Amendment IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people. [Ratified December 1791]

Amendment X

The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people. [Ratified December 1791]

[*U.S. Const.* amend. IX and X.]

We begin with a discussion of the Tenth Amendment, which has been more commonly asserted as a source of authority for recall. According to that analysis, because the right of recall was explicit in the Articles of Confederation, and because it was not specifically delegated in the Constitution, it is among the powers that are reserved by the Tenth Amendment to the states, and to the

people. In part that argument rests on the familiar notions that our federal government is one "of limited and enumerated powers . . ." 2 Story § 1907. Thus, any power not specifically delegated is reserved. As Justice Story observed:

> [W]hat is not conferred is withheld, and belongs to the State authorities if invested by their constitutions of government respectively in them; and if not so invested, it is retained BY THE PEOPLE, as a part of their residuary sovereignty.
> [*Ibid.*]

Nor does *U.S. Term Limits*, relied upon by the majority, *ante* at 125–26, 7 *A.*3d at 748, support the proposition that the Tenth Amendment could not have reserved the recall power. The argument that the federal government did not exist prior to the ratification of the United States Constitution, and that because the Senate therefore did not previously exist, there was no recall power to be reserved, requires a kind of parsing that ignores the earlier confederation in its entirety. And as Justice Stevens commented, "the right to choose representatives belongs not to the States, but to the people." *U.S. Term Limits, supra*, 514 *U.S.* at 820–21, 115 *S.Ct.* at 1863, 131 *L.Ed.*2d at 911. In the context of a government of limited powers, if it was not delegated to some branch of the federal government, and not expressly delegated anywhere else, it is reserved. Whether it was reserved to the states, which would make sense in light of the fact that their legislatures were authorized to elect Senators at the time, or to the people, where it remained unused pending the restoration to them of the power to elect through the Seventeenth Amendment, it did not simply vanish.

The Ninth Amendment offers further evidence in support of the right to recall. That Amendment essentially lay dormant before becoming the focal point for the debate over inherent individual rights to privacy, *see Griswold v. Connecticut*, 381 *U.S.* 479, 85 *S.Ct.* 1678, 14 *L.Ed.*2d 510 (1965), when Justice Douglas included it among his sources for the "penumbra[l]" rights, *id.* at 484, 85 *S.Ct.* at 1681, 14 *L.Ed.*2d at 514–15. Justice Goldberg's concurrence, likewise, used the Ninth Amendment as the source of a variety of fundamental human rights not otherwise specified. *See id.* at 488–

96, 85 *S.Ct.* at 1684–88, 14 *L.Ed.*2d at 517–22 (Goldberg, J., concurring). Those views provoked the dissent in which Justices Stewart and Black argued that because the Ninth Amendment was intended to limit the power of the federal government, using it as a means that would effectively expand federal power twisted its purposes. *Id.* at 519–20, 85 *S.Ct.* at 1701, 14 *L.Ed.*2d at 536–37 (Black, J., dissenting); *id.* at 529–30, 85 *S.Ct.* at 1706, 14 *L.Ed.*2d at 542 (Stewart, J., dissenting). In the decades that have followed, scholars have taken up the debate, arguing fervently about the historical origins of the Ninth Amendment and its relationship to the Tenth Amendment, as part of their effort to understand what they mean.

Both Amendments spring from the ratifying debates, in which several of the states expressed grave concerns about the absence of an expression of the agreed-upon fundamental rights of the people. *See* McAffee, *supra,* 69 *Temp. L.Rev.* at 69. At the time, state legislatures were considered to be bodies of general authority, with the result that only those rights that were expressly reserved to the people were retained. To some extent, the Articles of Confederation operated in a similar fashion, because they focused on rights that the states ceded to the national body as if the states were the essential repository of all authority. *See* 1 Morison & Commager, *supra,* at 228 ("The Federal Government [through the Articles of Confederation] received only those powers which the colonies had recognized as belonging to king and parliament.").

In creating the federal government, the Founders embarked on a very different course, intentionally creating a government "of limited and enumerated powers," 2 Story § 1907, a system in which all powers not expressly designated to the federal government were reserved to the states or the people. Whether the document that emerged from the Constitutional Convention achieved that goal became the subject of "intense debate" that eventually gave rise to the Ninth Amendment. McAffee, *supra,* 69 *Temp. L.Rev.* at 69.

In the ratifying debates, the Federalists argued ardently that this is precisely what the Constitution achieved, an intentional scheme so self-evident it did not need further expression. *Id.* at 69–70. The Anti–Federalists insisted that the failure to enumerate the basic rights of the people might allow for excessive expansion of clauses, in particular, the Necessary and Proper Clause of Article I, to the detriment of the people's essential liberties. Letters from the Federal Farmer IV (Oct. 12, 1787), *in* 2 *The Complete Anti–Federalist* 247 (Herbert J. Storing ed., 1981); *see* Thomas B. McAffee, *The Original Meaning of the Ninth Amendment,* 90 *Colum. L.Rev.* 1215, 1228–29 & n.51 (1990). As an example, delegates to the ratifying conventions argued that in the absence of the protections eventually embodied in the Fourth Amendment, Congress might revert to the practice of the use of general warrants. 1 Annals of Cong. 456 (Joseph Gales ed., 1834).

The essence of that debate turned to the problem of whether an enumeration of rights might somehow create the implication that the limited rights granted to the federal government were actually not so limited. That is, the concern was that if, for example, the rights included the right of a free press, it might imply that the federal government had been given the authority to regulate the press in some fashion. James Wilson, Speech at a Public Meeting in Philadelphia (Oct. 6, 1787), *in* 13 *The Documentary History of the Ratification of the Constitution* 339–40 (John P. Kaminski & Gaspare J. Saladino eds., 1981); *see* McAffee, *supra,* 69 *Temp. L.Rev.* at 87. The Federalists were concerned that the very mention of rights they thought were plainly not given over to the federal government would imply that the Constitution did not actually create a limited government after all. *See* Kurt T. Lash, *The Lost Original Meaning of the Ninth Amendment,* 83 *Tex. L.Rev.* 331, 391 (2004). Some of the states ratified the Constitution only on the condition that it be immediately amended to include an expression of these agreed-upon fundamental rights as a safeguard against expansive federal power, *see generally* 1 Morison & Commager, *supra,* at 259–60, apparently finding the

Federalist insistence on the clear meaning of the document to be insufficient protection.

The Ninth Amendment, which originated in the Virginia ratifying convention, and which both in its original and final form was drafted by the Federalist James Madison, was designed to solve this problem. McAffee, *supra*, 69 *Temp. L.Rev.* at 73; *see* 1 Annals of Cong., *supra*, at 449–59 (reprinting Madison's remarks about proposed amendments). And as one scholar has commented, "it was no accident that the Ninth Amendment was placed alongside the Tenth." Lash, *supra*, 83 *Tex. L.Rev.* at 336. The two were designed to work in tandem to guard against expansive interpretations of the words of the Constitution that grant power to the federal government and to ensure that both the expressed and unexpressed, but retained, rights of the people be inviolate. McAffee, *supra*, 90 *Colum. L.Rev.* at 1307. As part of the way to accomplish that goal, "the Ninth Amendment also counsels against construing federal power as exclusive of concurrent state authority, unless absolutely necessary." Kurt T. Lash, *A Textual–Historical Theory of the Ninth Amendment*, 60 *Stan. L.Rev.* 895, 930 (2008).

We need not recount in detail the debates that brought about the separate inclusion of the Ninth and Tenth Amendments to demonstrate that the purpose of the Ninth, as described in the words of its author James Madison, was "guarding against a latitude of interpretation" of the limited rights granted to the federal government. Lash, *supra*, 83 *Tex. L.Rev.* at 336; 2 Annals of Cong.1944–52 (1791) (reprinting Madison's Speech in Congress Opposing National Bank, Feb. 2, 1791). In his opposition to the bill to establish a national bank, which he regarded as an improper extension of the Necessary and Proper Clause, 2 Annals of Cong., *supra*, at 1947–48, Madison cautioned that if a power is not given in the Constitution to the federal government "the exercise of it involves the guilt of usurpation." 2 Annals of Cong., *supra*, at 1951. One scholar has concluded that Madison's speech explaining the meaning, and the essential power, of the Ninth Amendment

was sufficient to end the debate in Virginia about the necessity for ratification of the Bill of Rights. *See* Lash, *supra*, 83 *Tex. L.Rev.* at 333–34.

Understanding the separate roles of the Ninth and Tenth Amendments is necessary in order that they be seen neither as redundant nor as mere surplusage. The Ninth stands as the expression that the power of the federal government is limited and as an essential reminder that the interpretation of its powers is bounded by the rights of the people. The Tenth serves instead as an express reservation of non-enumerated rights to the states or the people. The importance of the rights expressed by the Ninth for this debate is therefore plain. It assures the several States, and the people thereof, that the intentionally limited grant of powers to the federal government will remain so; that expansive readings will be eschewed in favor of interpretations that appreciate the true nature of the constitutional scheme. True faithfulness to fundamental constitutional principles requires that a known right, like the right to recall, could neither be granted nor obliterated by implication; the federal government, not having an express clause in the Constitution relating to Congress that prohibits recall, cannot have its powers expanded by means of the "latitude of interpretation" needed to support the result the majority reaches. On the contrary, operating both separately and in tandem, the Ninth and Tenth Amendments demand otherwise.

## E.

Finally, we turn, as we must, to a brief consideration of the significance of the Seventeenth Amendment. Its ratification marked the triumph of the populist effort to return power to the people and to wrest it from the grip of the states' legislatures. But more important for the issue now before this Court is the historical evidence that rights not expressly mentioned in the Constitution were exercised by many states to control Senators and their service anyway. The simple fact is that the Seventeenth Amendment was adopted in recognition that in many of the states,

the people had already created methods to effectively take the power to choose Senators away from their legislatures, and to do so by "instructions," a means that the Framers had considered and explicitly rejected. *See* David A. Strauss, *The Irrelevance of Constitutional Amendments,* 114 *Harv. L.Rev.* 1457, 1496–98 (2001) (tracing history of instructions and of ratification of Seventeenth Amendment); Jay S. Bybee, *Ulysses at the Mast: Democracy, Federalism, and the Sirens' Song of the Seventeenth Amendment,* 91 *Nw. U.L.Rev.* 500, 521–24 (1997) (describing history of rejection of instructions).

The suggestion that the people were deprived, through the ratification of the Constitution, of the power to affect election of Senators, is historically inaccurate. Although the compromise achieved through which the Senate would be elected by the several states' legislatures rather than by popular ballot is part of the majority's reasoning as to why they believe that the people were deprived of the right to recall Senators, efforts in the states to effectively bypass the Constitution's scheme for their election surfaced quickly. "Beginning in the 1830s ... aspiring Senators began appealing directly to the electorate to vote for state legislative candidates who were pledged to support them for the Senate." Strauss, *supra,* 114 *Harv. L.Rev.* at 1496. One scholar has pointed to the Lincoln–Douglas debates as a prime example of this trend. *Id.* at 1496–97. Those debates, although held while the two men were campaigning for the Senate, were aimed at the public in order to influence the voters to elect state representatives who would support them. *Ibid.* Thereafter, states began to devise strategies that would approximate direct election, including holding primaries that would designate candidates for the Senate, *id.* at 1497, and requiring pledges from candidates for state legislatures that they would be bound by those votes. *Id.* at 1497–98.

Similarly, the right of instruction, which was included in several states' constitutions, *see* Bybee, *supra,* 91 *Nw. U.L.Rev.* at 524, has a long history relevant to our inquiry, *see* Christopher Terra-

nova, *Note: The Constitutional Life of Legislative Instructions in America*, 84 *N.Y.U. L.Rev.* 1331, 1333–39 (2009); Kenneth Bresler, *Rediscovering the Right to Instruct Legislators*, 26 *New Eng. L.Rev.* 355, 359–60 (1991). Also with deep historical roots, it was discussed during the Constitutional Convention because the delegates from Delaware were "restrained by their commission" from agreeing to any change in the equal representation of the states. 1 Farrand 37. Following ratification, it was used commonly as a method to control the votes of the individual Senators, some resigning or declining to stand for re-election because their views differed from their instructions. Bybee, *supra*, at 525–27. More surprising, in spite of the fact that instructions were rejected from inclusion in the Constitution, the practice was used to force the Senate as a whole to bow to the will of the several States that Senate proceedings be open to the public. *Id.* at 524; 4 Annals of Cong. 33–34 (1794). The practice of instructions died out with the ratification of the Seventeenth Amendment, Bybee, *supra*, at 527, but it is significant for the current debate to note that its absence from the Constitution was not raised as an impediment to its rather regular use by the States.

## IV.

There is precious little reason for this Court to wade into the constitutional question it has seen fit to resolve. There is even less reason for this Court to reach the conclusion it has embraced, rejecting as unconstitutional New Jersey's constitutional and statutory recall election mechanism. The notion that the people of the State of New Jersey, having amended their own Constitution to provide for the power of recall and having implemented that power through the enactment of comprehensive legislation, cannot recall one of their representatives because he happens to be a United States Senator is both illogical and offensive. Taken to its logical conclusion, the majority would tell the citizenry of New Jersey that it cannot recall one of its U.S. Senators even if he or she is indicted, convicted and incarcerated but not impeached; in

those circumstances, the majority would conclude that the people of New Jersey have no means to avoid being disenfranchised.

When hundreds of thousands of our fellow citizens voted to create a recall mechanism by constitutional amendment, they set a high standard for bringing that machinery to bear. They did so intentionally, to reserve recall for only those infrequent cases in which it is truly warranted. As we have seen, in this circumstance, those who would invoke the remedy of recall would need, in a short time span, to amass signatures of more voters than it took to elect the Senator in the first place, *supra*, at 116 n. 7, 7 *A*.3d at 742–43 n. 7.

Nothing in the record, nothing in history, and nothing in our common shared experience suggests that recall will so threaten the work of the Senate, or of the federal government, or even the life of the one who now holds that office, that it should be denied. Nothing suggests that the people gave up that right when joining together as a Republic and binding themselves to the Federal Constitution. Indeed, it is only by lifting up a narrow and historically unsupportable view of the federal system that the majority can argue for the result it reaches.

In effect, the majority sees the Senate as an institution immune from criticism, even of the most profound and fundamental kind; it sees not a part of a federal system, but an elitist institution the members of which should not have to be troubled by what the people they represent believe, save for the necessity of having to return and convince the people to vote them back into office every six years.

Today, the Court that in the past has taken stands, time and again, for the rights of the people to have a choice about who shall govern them, *see New Jersey Democratic Party, Inc. v. Samson*, 175 *N.J.* 178, 186, 814 *A*.2d 1028 ("The concept is simple. At its center is the voter, whose fundamental right to exercise the franchise infuses our election statutes with purpose and meaning."), *cert. denied*, 537 *U.S.* 1083, 123 *S.Ct.* 673, 154 *L.Ed*.2d 582 (2002), condemns those same people to impotence. Today, the

Court that just a few short months ago insisted that our local boards and bodies cannot foreclose dissent and debate, *see Besler v. Bd. of Educ. of W. Windsor,* 201 *N.J.* 544, 569, 993 *A.*2d 805 (2010) ("Our free society must give breathing room for an 'uninhibited' and 'robust' discussion of public issues, even when it 'include[s] vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'") (quoting *New York Times Co. v. Sullivan,* 376 *U.S.* 254, 270, 84 *S.Ct.* 710, 721, 11 *L.Ed.*2d 686, 701 (1964)), does precisely that.

Worse still, the Court takes that step, the step of silencing voices of protest and foreclosing debate, when one of the most important decision-making bodies in the land is its focus. Today is indeed a sad and dark day in the history of this Court. We cannot, and we will not, join in the unconstitutional disenfranchisement of New Jersey's citizens. We, therefore, dissent.

*For reversal and vacation*—Chief Justice RABNER and Justices LONG, LaVECCHIA, and ALBIN—4.

*For affirmance*—Justices RIVERA-SOTO and HOENS—2.